576 F.2d 620
 6 O.S.H. Cas.(BNA) 1784, 1978 O.S.H.D. (CCH) P 22,867
CENTRAL OF GEORGIA RAILROAD COMPANY, Petitioner,
v.
OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION and Ray
Marshall, Secretary of Labor, Respondents.
 No. 77-2111.
 United States Court of Appeals,
Fifth Circuit.
 July 13, 1978.
 
 Edgar A. Neely, Jr., Richard K. Hines, Atlanta, Ga., Charles A. Horsky, Jeffrey S. Berlin, William P. Stallsmith, Jr., Washington, D. C., for petitioner.
 Diane E. Burkley, Carin A. Clauss, Sol. of Labor, Benjamin W. Mintz, Associate Sol. for Occupational Safety & Health, Allen H. Feldman, Acting Counsel, Dept. of Labor, Washington, D. C., for respondents.
 Lawrence M. Mann, William A. Hutchins, Washington, D. C., for intervenor United Transp. Union.
 On Petition to Review an Order of the Occupational Safety and Health Review Commission.
 Before TUTTLE, GEE and FAY, Circuit Judges.
 GEE, Circuit Judge:
 
 
 1
 Section 5 of the Occupational Safety and Health Act (OSHA), 29 U.S.C. §§ 651-678, requires that every employer:
 
 
 2
 (1) shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees;
 
 
 3
 (2) shall comply with occupational safety and health standards promulgated under this Act.
 
 
 4
 29 U.S.C. § 654(a). Among the standards promulgated under the Act is the general housekeeping requirement that "all places of employment . . . shall be kept clean and orderly and in a sanitary condition." 29 C.F.R. § 1910.22(a)(1).
 
 
 5
 In late 1974 OSHA investigators discovered a breach of this standard on and near railroad tracks where Central of Georgia Railroad employees work. The point now at issue is not whether those conditions in fact existed, but rather who is to be held responsible. In brief, the Occupational Safety and Health Review Commission (OSHRC) thinks that it can fix the blame on the petitioner, Central of Georgia Railroad Company, whose employees were exposed to the violative conditions, whereas Central argues that the only culprit must be the Continental Can Corporation, on whose property the conditions occurred.
 
 
 6
 The backdrop to the controversy is an arrangement between Central and Continental Can concerning railroad transportation service to and from the Continental Can plant at Augusta, Georgia. Under a 1963 agreement Central was to construct spur tracks from its main Augusta track in order to service the Continental plant. Continental, on its side, constructed connecting tracks through its own plant facility in accordance with the railroad's specifications. The railroad was to provide switching services for shipments to and from the Continental plant. The tracks within the plant facility were Continental's property, and under the contract Continental retained "jurisdiction" over these tracks, as well as the right to control entry to the property. However, railroad employees were permitted to enter the plant facility area for the purpose of delivering and receiving freight shipments; at the time this controversy arose, a Central switch engine and crew entered twice daily to pick up and deliver freight cars.
 
 
 7
 According to the 1963 agreement, Continental Can was to maintain its tracks in safe operating condition, and indeed the contract gave Central the right to suspend service if Continental Can failed to maintain the tracks in a condition satisfactory to the railroad. At least as early as April 1973, Central noticed debris and drainage problems along the tracks over which its switching crews walked in the Continental plant facility. Over the next year and a half, Central's officers in Augusta wrote six letters complaining of these problems, and they apparently made a number of telephone calls as well. Upon inspection in October 1974, however, OSHA investigators discovered mud, oil, lime, and other debris, along with water-filled depressions, on and around the tracks at the Continental Can plant. On the basis of this discovery the Secretary of Labor issued a citation against Central for a "nonserious" violation of the housekeeping regulation quoted above, stating that the violating conditions constituted a hazard by impeding the crews' safe walking and safe climbing on railway car ladders.[1]
 
 
 8
 The railroad contested this citation, saying, among other things, that Continental Can was responsible for the track area in question. The Administrative Law Judge (ALJ) ruled that a violation had been established but assessed a penalty of only $25, noting Central's "good faith" as evidenced in its letters and telephone calls to Continental Can and noting as well that the violation occurred on Continental Can's property where Central had no legal authority to enter and abate the condition. The OSHRC affirmed the ALJ's finding of a violation and $25 penalty, saying that "even if it is assumed" that the railroad did not create the hazardous conditions and did not control the hazard in such a way as to be able to abate it to meet the OSHA standard, the railroad nevertheless had and should have exercised an alternative means to protect its employees: it should have exercised its contractual right to suspend services until Continental Can took the necessary corrective action.
 
 
 9
 From this ruling the railroad petitions, again pointing out that Continental Can not Central was contractually responsible for maintaining the tracks and pointing out further that it had no authority to enter the property and abate the cited conditions. Under these circumstances, it says, not Central but Continental Can is responsible for any violation, and only Continental Can should have been cited. It relies chiefly on Anning-Johnson Co. v. OSHRC, 516 F.2d 1081 (7th Cir. 1975), a case in which the Seventh Circuit ruled that a subcontractor (one of a number on a construction site) could not be held liable for a nonserious violation to which its employees were exposed where the conditions causing the violation of the standard were created by and were within the control of third parties.
 
 
 10
 While we agree with Anning-Johnson that issues of creation and control of a violation are important in determining liability for a nonserious violation under section 5(a), we do not believe we can apply the reasoning of Anning-Johnson directly to the present case. Central's bilateral arrangement with Continental Can does not fit easily into the mold of the relationship between a general contractor and a subcontractor. This is reflected in Central's arguments; at times the railroad appears to analogize itself to a subcontractor saying that on the reasoning of the Seventh Circuit in Anning-Johnson it should not be responsible for a situation created and controlled by Continental Can whereas at other times it seems to wish to argue that it is the "general contractor" and thus cannot be held responsible for the acts of its "subcontractor," that is, Continental Can. See Southeast Contractors v. Dunlop, 512 F.2d 675 (5th Cir. 1975); cf. Brennan v. Gilles & Cotting, 504 F.2d 1255 (4th Cir. 1974); but see Clarkson Construction Co. v. OSHRC, 531 F.2d 451 (10th Cir. 1976).
 
 
 11
 Moreover, much of the Seventh Circuit's reasoning in Anning-Johnson relates specifically to the intricacies of multi-employer construction contracts where a variety of subcontractors enter the workplace, each carrying out a defined, specialized task over a finite period of time. This reasoning does not apply, or applies only with lessened force, to the circumstances of the present case. Thus, Anning-Johnson notes that if liability were to be placed on the subcontractor, the subcontractor, in abating a hazard, would be required to undertake tasks entirely outside its knowledge and expertise and perhaps outside the jurisdiction of its craftsmen. But here Central clearly understood the technology of maintaining tracks; the tracks in question were built according to its specifications, and it apparently inspected these tracks to see whether they were properly maintained. Indeed, the contract contains one clause under which, on Continental Can's written request, Central could do work for Continental Can and charge for the cost of work and materials. Thus, Anning-Johnson's concern about lack of technical expertise can hardly apply here. By the same token, a second consideration in the Seventh Circuit's Anning-Johnson opinion has little weight in the circumstances of this case: that is, that confusion and disruption in normal working relations could result if liability were imposed on a variety of subcontractors in addition to the general contractor. But we see little possibility of duplication of effort where at most only two parties to a contract might potentially be held liable for repairs; we also see little possibility in the present case that a contracting party with greater bargaining power could shift responsibility to a weaker party another concern of Anning-Johnson in the general contractor/subcontractor context. Finally, the Seventh Circuit in that case remarked that if a subcontractor were required to remove his employees from the workplace as an alternative to abatement of the hazard, the operations of an entire project, and of all other subcontractors, could be brought to a halt. But Central's cessation of switching and delivery services to Continental supposing that this were an appropriate and possible response might well not be so intimately related to Continental's production activities as to halt the latter.
 
 
 12
 For all these reasons we do not believe that the Seventh Circuit's discussion of a subcontractor's liability in Anning-Johnson bears directly on the issue of Central's potential liability in this case. And on the other side, there are several independent reasons why liability might appear to be more appropriate for a contractor in Central's position. The track in question, even though located on Continental property, was a permanent workplace for Central employees; and it was Central's employees, not Continental's, who were exposed to any hazard resulting from the conditions around the tracks.
 
 
 13
 Nevertheless, Anning-Johnson does point to an issue we regard as important in fixing liability that is, the degree to which the party charged does control the alleged hazard and the degree of his ability actually to abate that hazard. As has often been said, OSHA does not impose strict liability on an employer but rather focuses liability where the harm can in fact be prevented. See, e. g., Horne Plumbing & Heating Co. v. OSHRC, 528 F.2d 564 (5th Cir. 1976); Brennan v. OSHRC and Hendricks, d/b/a Alsea Lumber Co.,511 F.2d 1139 (9th Cir. 1975); National Realty & Construction Co. v. OSHRC,160 U.S.App.D.C. 133, 489 F.2d 1257 (1973). The Commission, albeit somewhat uncertainly, has stated that it generally accepts the Seventh Circuit's Anning-Johnson position on at least some aspects of the control problem in a multi-employer workplace. Secretary v. Anning-Johnson Co., Docket Nos. 3694 & 4409, May 12, 1976, 4 OSHC 1193 (BNA); cf. Secretary v. Grossman Steel & Aluminum Co., Docket No. 12775, May 12, 1975, 4 OSHC 1185 (BNA). The Commission continues to regard the employer as primarily responsible for violations to which his employees are exposed. But it now takes the position that once the Secretary has established a prima facie case[2] of an employer's violation of a section 5(a) duty the employer may demonstrate, as an affirmative defense, that it neither created nor controlled the hazardous condition. Once the employer has established this lack of control, according to the Commission, he must go on to show that the employees exposed to the hazard were protected by means of realistic measures taken as an alternative to literal compliance with the cited standard; or alternatively, that the employer did not have notice actual or constructive that the condition was hazardous. Anning-Johnson (Commission opinion), supra; see also Grossman, supra.
 
 
 14
 We regard the Commission's position at least in part as an allocation of burdens of proof. Under this allocation the Secretary must first make out a prima facie case; the burden then shifts to the employer to rebut this prima facie case; or if he does not do so, he may establish an affirmative defense by showing his own lack of control over the hazard, and according to the Commission his protection of the employees through alternative measures. For reasons discussed below, we need not consider the Commission's "alternative measures" requirement in the context of this case. Aside from this point, however, we think that the Commission's allocation of burdens is appropriate. It may be assumed that under ordinary circumstances the employer does control the workplace of his employees, and if he does not, the information establishing his lack of control is more apt to be available to him than to the Secretary. Thus, it seems entirely suitable to allocate to the employer the burden of showing his lack of control. The Commission's interpretations of OSHA's provisions are entitled to deference where they are reasonable and consistent with the Act's purposes. See Marshall v. Knutson Construction Co., 566 F.2d 596, 600 (8th Cir. 1977) and authorities cited therein. The Commission's allocation of burdens meets this test.
 
 
 15
 While the Commission viewed this case as one in which the employer had failed to show that he took "realistic alternative measures" to protect his employees, it need not have reached, and we do not reach, this stage of the analysis. The case is more aptly framed as one in which the employer failed to meet the burden of showing his lack of control over the violative conditions. Central argues that its contract with Continental Can placed responsibility for track maintenance on Continental and also prevented Central from entering to abate the cited conditions without Continental's consent. But as the Commission has noted, an employer may not contract out of its statutory responsibilities under OSHA. Anning-Johnson, 4 OSHC at 1198 n. 8 (BNA), and cases cited therein. If an employer does contract with a third party to maintain safe conditions, it is to be presumed that the employer can enforce the contract. We are unimpressed by Central's arguments that it could not enforce the present contract. The contract itself entitled Central to suspend operations if Continental Can failed to maintain the tracks.[3] According to Central, it could not suspend services except by permission of the Georgia Public Service Commission, but there is no showing that Central ever approached that commission. If indeed suspension of services is not the suitable means to enforce this contract, Central is the party in the best position to know about other means short of suspension. No doubt it does indeed know such means; the record shows that Continental Can repaired the offending tracks very shortly after Central was cited. Be that as it may, it was Central's burden to show the unavailability of such means, and it has not met its burden to show lack of control.
 
 
 16
 We stress that the Act, not the contract, is the source of Central's responsibilities. See Frohlick Crane Service, Inc. v. OSHRC, 521 F.2d 628, 631 (10th Cir. 1975). An employer may carry out its statutory duties through its own private arrangements with third parties, but if it does so and if those duties are neglected, it is up to the employer to show why he cannot enforce the arrangements he has made. If he cannot make this showing, he must take the consequences, and his further remedy lies against the private party with whom he has contracted and whose breach exposes the employer to liability. Since we do not think that Central has shown why it could not enforce its arrangements here, it has failed to meet its burden to show that it lacked control. We therefore need not consider or pass on the validity of the Commission's further ground, i. e., that "even if it is assumed" that Central neither created nor controlled the hazardous condition, the railroad still had the duty to take realistic alternative measures. We note only that, as the Second Circuit has pointed out, "(t)he violation cannot stand upon unsupported generalizations that an employer's efforts . . . have not gone 'far enough' and that . . . (the violation) is 'preventable' without evidence of what more the employer could have done and some basis to conclude that further efforts would have been feasible and successful . . . ." General Electric Co. v. OSHRC, 540 F.2d 67, 70 (2d Cir. 1976). Feasibility, of course, may be assumed where the requirements for compliance are clear. See Ace Sheeting & Repair Co. v. OSHRC, 555 F.2d 439 (5th Cir. 1977).
 
 
 17
 Central argues that since Continental Can was the logical party to charge with the violation, Continental alone should have been cited. This amounts to an argument that only one violator may be cited for any OSHA violation. It is not entirely clear, however, that Continental Can could in fact have been cited for this violation, which exposed not Continental Can employees but Central employees to potential hazards; certainly this point was not clear at the time the citation issued. See Gilles & Cotting, 504 F.2d at 1255; see also Anning-Johnson (Seventh Circuit opinion), 516 F.2d at 1091 n. 21. But even if Continental might have been cited, this would not necessarily have relieved Central of its duties.[4] In this case Central has failed to adduce any cogent reason why it should be so relieved. The citation was proper, and the Commission's decision enforcing it is AFFIRMED.
 
 
 
 [1]
 The citation also charged Central with failure to display a required OSHA poster. This alleged violation was vacated in the course of the administrative proceedings and is not at issue here
 
 
 [2]
 According to the Commission, this ordinarily entails a showing that (1) a specific standard applies; (2) there was a failure to comply with a standard; and (3) the cited employer's employees had access to the hazard. 4 OSHC at 1197 (BNA)
 
 
 [3]
 This contractual provision puts suspension of services in a different light from suspension in some construction cases, e. g., Anning-Johnson (7th Cir. opinion). Here suspension would not be a unilateral act but is rather a contractual remedy agreed upon by the parties in the event of Continental Can's failure to maintain the tracks satisfactorily. Cf. Secretary v. Williamette Iron & Steel Co., Docket No. 12516, May 16, 1977, 5 OSHC 1479 (BNA)
 
 
 [4]
 Some recent cases state that an employer may be held for violations of specific standards under § 5(a)(2), even though its own employees are not directly exposed to the violation. Knutson, 556 F.2d at 599; Bechtel Power Corp. v. Secretary of Labor, 548 F.2d 248 (8th Cir. 1977); Brennan v. OSHRC and Underhill Construction Co. v. Brennan, 513 F.2d 1032 (2d Cir. 1975); but these cases do not purport to relieve the primary employer of his statutory duties. The Seventh Circuit's Anning-Johnson opinion does suggest that allocation of responsibility to a single employer might avoid confusion and disruption. However, the holding of that case does not rest on this ground, and in any event, as mentioned above, these efficiency considerations appear to be especially related to the problems of a multi-employer construction site