**William E. BROCK, Secretary of Labor, Petitioner,**

v.

**CITY OIL WELL SERVICE CO., and Occupational Safety and Health Review Commission, Respondents.**

No. 85–4376.

United States Court of Appeals, Fifth Circuit.

July 30, 1986.

Joseph M. Woodward, John Amodeo, U.S. Dept. of Labor, Washington, D.C., for petitioner.

Keith A. Glover, George R. Carlton, Jr., Dallas, Tex., for respondents.

Before IRVING L. GOLDBERG, JERRE S. WILLIAMS and W. EUGENE DAVIS, Circuit Judges.

## OPINION

IRVING L. GOLDBERG, Circuit Judge:

Colorless, flammable, and with an odor like that of rotten eggs, hydrogen sulfide gas ($H_2S$) is a deadly byproduct of oil and gas production. On June 4, 1981, two employees of respondent City Oil Well Service Co. (City), a corporation engaged in the business of servicing oil wells, were swabbing a newly drilled oil well near Nixon, Texas.[1] While on top of a tank, which was within one hundred feet of the well, the two workers were asphyxiated by $H_2S$.[2]

Like the French and English soldiers in the First World War, the two workers were completely unprepared for deadly gas. City had not provided them with monitoring equipment, respirators, or safety instructions of any sort. While the workers could try to stand upwind of any gas, this common-sense precaution was unreliable at best, as $H_2S$ deadens the olfactory nerves, making its continued detection by smell problematic.

As a result of an inspection of the deaths by a compliance officer of the United States Department of Labor, Occupational Safety and Health Administration ("OSHA"), the Secretary of Labor cited City for violating section 5(a)(2) of the Occupational Safety and Health Act of 1970 (the "Act"), 29 U.S.C. § 654(a)(2),[3] by failing to comply with the health standards found at 29 C.F.R. §§ 1910.134(a)(1) and (2), which relate to the provision of respirators to protect against toxic air contaminants. An Administrative Law Judge (ALJ) of the Occupational Safety and Health Review Commission (OSHRC) found that petitioner had failed to carry its burden of proof under the regulations and therefore vacated the citations. Anticipating the possibility that his legal conclusion as to the Secretary's burden of proof might not survive an appeal, the ALJ made alternative findings in order to avoid a remand. The short-handed two member OSHRC split, and therefore entered an order making the ALJ's decision the final, appealable order of the Commission. We reverse the order of the Commission and remand the case to the Commission for entry of judgment in favor of petitioner.

## DISCUSSION

The regulations with whose violation City has been charged read as follows:

**Respiratory protection.**

(a) *Permissible practice.* (1) In the control of those occupational diseases exposure to $H_2S$ shall not exceed 20 ppm at any time during an 8-hour shift, with the exception that it may reach 50 ppm, provided the exposure lasts no more than 10 minutes and no other measurable exposure occurs during the shift.

---

1. Swabbing consists of lowering a plug, or swab, on a wire to the bottom of the well and pulling it to the top to remove accumulated fluid so that the well can be put into production. The two workers here first drew off and drained the fluid through a flow line into an open pit, but after an hour they diverted it to an enclosed "frac" tank where it could be measured and the flow rate of the well determined. In order to perform this measurement and to "rig down" or disconnect the flow line, the employees had to be on top of or near the frac tank.

2. While we have no way of knowing the concentration of gas at the well at the time of the workers' deaths, subsequent testing revealed $H_2S$ at the wellhead, after the valves had been bled for several minutes, in a concentration of 225 parts per million (ppm). That concentration far exceeded the maximum permissible employee exposure limits in Table Z–2 of 29 C.F.R. § 1910.1000, which provides that an employee's

3. 29 U.S.C. § 654(a) reads as follows:
   Each employer—
       (1) shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees;
       (2) shall comply with occupational safety and health standards promulgated under this chapter.
   The Secretary initially alleged that City had violated subsection (a)(1), the Act's "general duty clause." Because a more specific regulation covered the violation, the Secretary amended the complaint to charge a violation of subsection (a)(2).

caused by breathing air contaminated with harmful dusts, fogs, fumes, mists, gases, smokes, sprays, or vapors, the primary objective shall be to prevent atmospheric contamination. This shall be accomplished as far as feasible by accepted engineering control measures (for example, enclosure or confinement of the operation, general and local ventilation, and substitution of less toxic materials). When effective engineering controls are not feasible, or while they are being instituted, appropriate respirators shall be used pursuant to the following requirements.

(2) Respirators shall be provided by the employer when such equipment is necessary to protect the health of the employee. The employer shall provide the respirators which are applicable and suitable for the purpose intended. The employer shall be responsible for the establishment and maintenance of a respiratory protective program which shall include the requirements outlined in paragraph (b) of this section.

29 C.F.R. §§ 1910.134(a)(1) and (2) (1986). Among the ten listed requirements of a respiratory protective program outlined in paragraph (b) are the following:

(b) *Requirements for a minimal acceptable program.*

(1) Written standard operating procedures governing the selection and use of respirators shall be established.

(2) Respirators shall be selected on the basis of hazards to which the worker is exposed.

(3) The user shall be instructed and trained in the proper use of respirators and their limitations.

. . . .

(8) Appropriate surveillance of work area conditions and degree of employee exposure or stress shall be maintained.

(9) There shall be regular inspection and evaluation to determine the continued effectiveness of the program.

City failed to take *any* of these or other possible steps to protect its employees from the potential hazard of $H_2S$ at this or any other well that it serviced. Neverthe-

less, the ALJ vacated the citations. City argued, and the ALJ agreed, that proof by the Secretary that effective engineering controls were "not feasible" was a prerequisite for requiring respirators, even if engineering controls were not in fact used. In other words, City convinced the ALJ that the regulation does not require the employer to take any steps to protect its employees as long as the employer can show that unused engineering controls were nonetheless feasible. City acknowledges that this interpretation of the regulation creates a situation in which the employee could be left without the protection of either engineering controls or respirators.

Whether or not we choose to accept this departure from common sense and the goals of the Act turns on the interpretation of the following sentence from section (a)(1) of the regulation:

When effective engineering controls are not feasible, or while they are being instituted, appropriate respirators shall be used. . . .

City contends that this sentence requires an employer to supply respirators in only two circumstances: (1) when effective controls are not feasible, or (2) when effective engineering controls are being instituted. In effect then, City argues that the regulation's failure to state explicitly that respirators shall be used when effective engineering controls *are* feasible but not in use— *i.e.,* the regulation's failure to state the obvious—should allow City to slip through the regulatory net.

This interpretation is contrary to both Commission and Court precedent. The interpretation was implicitly rejected, in a factual situation virtually identical to that of the instant case, in *Secretary of Labor v. Snyder Well Services, Inc.,* 1982 CCH OSHD ¶ 25,943 (1982). In *Snyder* the employer argued, *inter alia,* that it had no duty to provide respirators so long as effective engineering controls were in use. The Commission first held that, because the controls in use could not protect against sudden excursions of high concentrations of $H_2S$, the controls were not in

fact effective. Then, without even considering the feasibility *vel non* of effective controls, the Commission found that respirators were therefore "necessary" within the meaning of the standard and affirmed the citation, holding: "To the extent that engineering controls do not afford protection, *or are not used*, respirators must be used." 1982 CCH OSHD at p. 32,511 (emphasis added). *Cf. Secretary of Labor v. Todd Shipyards Corp.*, 1981 CCH OSHD ¶ 25,516 (1981) (rejecting similarly tortuous construction of 29 C.F.R. § 1910.1000(e)).

This court rejected a similar construction of 29 C.F.R. § 1926.105(a) in *Brennan v. Southern Contractors Service*, 492 F.2d 498 (5th Cir.1974), a case involving the whens and wherefores of safety nets.[4] The Commission argued that if the use of one of the safety devices listed as an alternative to safety nets was practical, then the employer need not supply safety nets even though the alternative device was not in fact utilized by the employer.

The court squarely rejected this interpretation, reasoning that

the Commission's construction would eviscerate the import of the regulation and flout the purposes of the enabling legislation. The Occupational Safety & Health Act was designed to protect the health and safety of workers and to improve physical working conditions on employment premises. Under the Commission's interpretation, an employer unsolicitous of the safety of his employees could dodge the Act's sanctions merely by adducing evidence that a device listed in 29 C.F.R. 1926.105(a) could have been practically utilized. And under this interpretation, the regulation rather than

eliciting greater responsiveness on the part of employers would condone greater neglect.

*Id.* at 501 (citations omitted). The court therefore read the regulation "to require an employer to employ *either* a safety net or one of the other safety devices listed in the regulations, and hence that *failure to use any of such devices is a proper predicate for the imposition of sanctions* prescribed in the Occupational Safety and Health Act of 1979." *Id.* (emphasis added); *accord Brock v. L.R. Willson & Sons, Inc.*, 773 F.2d 1377, 1384 (D.C.Cir.1985) ("[T]he standard is not intended to point out escape routes by which *no* device need be used if one of the alternative devices can be shown to be practical even though not in fact used.") (quoting *Southern Colo. Prestress Co. v. OSHRC,* 586 F.2d 1342, 1350 (10th Cir.1978)).

■ We thus read 29 C.F.R. § 1910.-134(a)(1) to require an employer to provide *either* effective engineering controls *or* respirators to its employees. The requirement is made even clearer by the regulation's command that the employer supply respirators "while [effective engineering controls] are being instituted," which necessarily subsumes the idea that an employer must supply respirators when effective engineering controls are not being instituted. Proof that effective engineering controls are not feasible is not part of the Secretary's case. Any other interpretation is absurd and ridiculous. Any other conclusion would "eviscerate the import of the regulation and flout the purposes of the enabling legislation." *Southern Contractors Service, supra.*[5] We do not check our common sense at the courthouse door.[6]

---

**4.** 29 C.F.R. § 1926.105(a) provides:
   Safety nets shall be provided when workplaces are more than 25 feet above the ground or water surface, or other surfaces where the use of ladders, scaffolds, catch platforms, temporary floors, safety lines, or safety belts is impractical.

**5.** Even were we to affirm the ALJ's interpretation of subsection (a)(1), we would be compelled to reverse his conclusion that subsection (a)(2) also requires that the Secretary prove that

engineering controls are not feasible. Contrary to City's argument that the Secretary must first satisfy (a)(1) before it can move on to proving a violation of (a)(2), the requirements of (a)(2), which contain no reference to the feasibility of engineering controls, are independent of and can form the basis of a violation distinct from (a)(1).

**6.** *Cf. Mapp v. Ohio,* 367 U.S. 643, 657, 81 S.Ct. 1684, 1693, 6 L.Ed.2d 1081 (1961) ("There is no

■ In this case, it is beyond dispute that effective engineering controls were not in place. The record confirms that $H_2S$ could escape at the well head, at the open pit, and from the vent atop the frac tank during such operations. The only remaining question is whether City had a duty to provide respirators to its employees. The answer is clearly yes.

Section (a)(2) provides that "Respirators shall be provided by the employer when such equipment is necessary to protect the health of the employee." Although the well here was not expected to produce $H_2S$, other wells within a few miles of the well had produced $H_2S$. Thus City, had it exercised reasonable diligence,[7] would have had notice of the risk of $H_2S$ emissions. Moreover, even had the well in this case been the first in the area to emit $H_2S$, that fact would not have excused City's failure to provide respirators and a respiratory protection program to its employees. The presence of hydrogen sulfide in oil and gas fields, while capricious, is nonetheless a constant risk, particularly while swabbing wells that have not yet been brought into production. The Act and its regulations exist to prevent an employer from gambling with the health and safety of its employees, as City did here. The well in this case, although expected to be free of $H_2S$, produced fatal levels of the gas, thereby confirming the risk. Under these circumstances, respirators were incontrovertibly necessary to protect the health of City's two employees.

■ City's only defense to its completely irresponsible behavior is a finger pointed at the well operator and the simultaneous incantation of industry custom. City points to a line of cases in which industry custom has been used to flesh out generally worded regulations in order to avoid notice problems under the due process clause.[8] According to City and the record, the custom and practice of the industry is for the well servicer to rely on the well operator or owner to advise it if $H_2S$ hazards are present and to provide respirators if necessary.

City's reliance on this line of cases is misplaced. The regulation here is precise. In City's case, it concerns only one hazard and two remedies. The hazard is hydrogen sulfide, which is listed as a dangerous substance in 29 C.F.R. § 1910.1000, where a permissible exposure to limit is set; the two remedies are effective engineering controls and respirators, the requirements for the selection, use, and maintenance of which are set out in detail. *See generally* 29 C.F.R. § 1910.134.

In any event, City cannot use industry custom to shift its statutory responsibility for the health and safety of its employees to third parties. The Act and its regulations place the burden of compliance squarely on the employer: "Each *employer* ... shall comply with occupational safety and health standards promulgated under this chapter," 29 U.S.C. § 654(a)(2) (empha-

---

war between the Constitution and common sense.")

**7.** The Secretary cited City for a "serious" violation. An element of a serious violation is that the employer knew, or could have known with the exercise of reasonable diligence, of the presence of the violation. 29 U.S.C. § 666(k) defines a "serious" violation as follows:

For purposes of this section, a serious violation shall be deemed to exist in a place of employment if there is a substantial probability that death or serious physical harm could result from a condition which exists, or from one or more practices, means, methods, operations, or processes which have been adopted or are in use, in such place of employment unless the employer did not, and could not

with the exercise of reasonable diligence, know of the presence of the violation.

We have held that a violation is "serious" under the Act "where, although the accident itself is merely possible (*i.e.,* in statutory terms, 'could result from a condition'), there is a substantial probability of serious injury if it does occur." *Shaw Construction, Inc. v. OSHRC,* 534 F.2d 1183, 1185 n. 4 (5th Cir.1976). Given the injuries that could and did result from exposure to $H_2S$, City's violation is clearly serious.

**8.** *See e.g., B & B Insulation, Inc. v. OSHRC,* 583 F.2d 1364 (5th Cir.1978); *Cotter & Co. v. OSHRC,* 598 F.2d 911 (5th Cir.1979); *S & H Riggers & Erectors v. OSHRC,* 659 F.2d 1273 (5th Cir.1981).

sis added); "Respirators shall be provided by the *employer* when such equipment is necessary to protect the health of the employee." 29 C.F.R. § 1910.134(a)(2) (emphasis added). Under the Act, it is the employer's responsibility to ensure that its employees are protected. It may accomplish this objective through others if it chooses, but the duty to provide the protection remains the employer's, and its agent's failure to comply with a standard constitutes a violation by the employer.

In *Central of Georgia Railroad Company v. OSHRC*, 576 F.2d 620 (5th Cir.1978), this court held that "an employer may not contract out of its statutory responsibilities under OSHA." *Id.* at 624. The Court stressed that

> the Act, not the contract, is the source of [the employer's] responsibilities. *See Frohlick Crane Service, Inc. v. OSHRC*, 521 F.2d 628, 631 (10th Cir.1975). An employer may carry out its statutory duties through its own private arrangements with third parties, but if it does so and if those duties are neglected, it is up to the employer to show why he cannot enforce the arrangements he has made. If he cannot make this showing, he must take the consequences, and his further remedy lies against the private party with whom he has contracted and whose breach exposes the employer to liability.

*Id.* at 625.

This reasoning applies with even greater force to the instant case, where the shift of responsibility was purportedly accomplished, not by a formal contract, but by a vaguely defined industry custom. Nor is there an issue, as in *Central of Georgia*, regarding City's ability to accomplish compliance. Although the worksite was on someone else's property, City could have satisfied the standard simply by providing respirators and a respiratory protective program. It needed no authority from the well operator or owner to do so. Under these circumstances, City must "take the

consequences" of its flagrant neglect of employee safety.

## CONCLUSION

This court can instruct the OSHRC to reinstate the citations, rather than remanding for further proceedings, if only one conclusion is supportable on the record before us. *Brock v. L.R. Willson & Sons, Inc., supra,* 773 F.2d at 1388. Only one conclusion is supportable on the record before us: City's failure to comply with the requirements of 29 C.F.R. §§ 1910.134(a)(1) and (2) created more than "a substantial probability that death or serious physical harm could result." [9] Hydrogen sulfide kills, and does so quickly, yet City took not the feeblest step to safeguard its employees. Its blind conduct fell far below the statutory minimum. Accordingly, the citation vacated by the OSHRC is hereby remanded with directions that it be reinstated, and the petition for review is

GRANTED.

---

9. *See* note 7 *supra.* A remand is also unnecessary given the ALJ's alternative findings, which are supported by substantial evidence. We have considered City's other claims and find them meritless.