[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-11537
Non-Argument Calendar

_____

Agency No. 17-1376

PACKERS SANITATION SERVICES, INC.,

Petitioner,

versus

OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION,

ACTING SECRETARY OF LABOR,

Respondents.

_____

Petition for Review of a Final Order of the
Occupational Safety and Health Review Commission

_____

(January 10, 2020)

Before WILSON, GRANT, and HULL, Circuit Judges.

PER CURIAM:

Packers Sanitation Services, Inc. petitions for review of a final order from the Occupational Safety and Health Review Commission finding the company liable for two serious violations and one other-than-serious violation of the Occupational Safety and Health Act of 1970.[1]  29 U.S.C. §§ 651–678.  An ALJ found the two serious violations after concluding that Packers was not maintaining safe walking–working surfaces and that it had failed to adequately guard employees from a piece of dangerous machinery.  *See* 29 C.F.R. § 1910.22(d)(1); § 1910.212(a)(1).  The ALJ found the non-serious violation for a failure to provide copies of requested business records within four business hours.  *See id.* § 1904.40(a).  Packers argues that substantial evidence did not support the ALJ's findings and that the ALJ abused her discretion in making evidentiary rulings.  We deny the petition for review.

---

[1] A company cited under the Act may challenge the citation by seeking review before the Commission, which is independent of the Department of Labor.  *See* 29 U.S.C. §§ 651(b)(3), 659(a), 661.  The citation will then be reviewed by an ALJ.  *Id.* §§ 659(c), 661(j).  If the Commission does not grant review within thirty days following the ALJ's decision to affirm, modify, or vacate the citation, then that decision becomes the final order of the Commission.  *See Roberts Sand Co., LLLP v. Sec'y of Labor*, 568 F. App'x 758, 759 (11th Cir. 2014) (citing 29 C.F.R. § 2200.90(d)).

2

I.

Packers provides sanitation services to poultry processing facilities.  One of its clients is the Pilgrim's Pride facility in Gainesville, Georgia.  That location processes around one million chickens per week.  After the Pilgrim's Pride employees are done for the day, Packers employees work an evening shift cleaning the equipment.

During processing, each chicken is sent to a "picking room," which contains a machine to remove the tail feathers from the chickens.  That machine, known as a quill puller, contains two rotating augers.  To clean the quill puller, a sanitation employee first hoses down the machine to knock off larger pieces of detritus (a process called the "first knockdown").  After completing the first knockdown, the employee then moves to the second stage of the process, a more fine-tuned cleaning of the machine.

This case arises from an injury that a Packers employee suffered while conducting the first knockdown.  On April 17, 2017, the employee began the first knockdown while the machine was still running.  After the employee stepped in too close to the machine, the rotating augers caught the employee's glove and pulled in his hand.  The employee's fingertip was amputated.

The Occupational Safety and Health Administration opened an investigation into the accident.  As part of the investigation, a compliance officer named Robin

3

Bennett and an industrial hygienist named Maria Martinez went to the Pilgrim's Pride plant eight days after the incident and met with representatives from Packers. Those representatives included Caitlin Wilson, a safety manager who acted as a Packers spokesperson. The representatives agreed that the OSHA officials could inspect the quill puller.

Wilson informed Bennett and Martinez that the injured employee had violated a workplace safety rule against putting your hand in a running machine and a rule requiring each employee to stay at least two feet away from an active quill puller. The group went to inspect the machine. While walking over to the machine, Bennett noticed a series of drains in the floor that lacked adequate covers. Orange cones were set up near the drains to alert employees of the defective drain covers. The Packers managers began to step over the drains, but the OSHA officials requested that the group take another route. One manager informed Bennett that the drains had been in that condition for at least a year. Wilson told Bennett that she thought the drains were outside the scope of Bennett's investigation; Bennett replied that the drains were in plain view.

At the end of the inspection, Bennett requested that Packers provide a listing of workplace injuries and illnesses known as an OSHA 300 log. *See* 29 C.F.R. § 1904.29. The copy that Packers eventually provided did not contain the incident that prompted the investigation.

Bennett recommended that the Secretary cite Packers for two serious violations: failing to maintain safe walking–working spaces and failing to appropriately guard the quill puller. *See id.* § 1910.22(d)(1) (walking–working surfaces); *id.* § 1910.212(a)(1) (failure to guard). Bennett also recommended that the Secretary cite Packers for one other-than-serious violation for failing to include the quill puller incident in their OSHA 300 log. The Secretary agreed and issued the citations.

Packers timely contested the citations, so the matter was referred to an ALJ for review. Before that review, the other-than-serious violation was amended after the company asserted that it properly logged the quill puller incident in its OSHA 300 log on April 21, 2017—but that it failed to provide the most current version of that log when Bennett made her request on April 25. The amended citation stated that by providing out-of-date records, Packers violated the requirement to provide appropriate records within four business hours. *See id.* § 1904.40(a) (requiring the company, upon request, to provide copies of "the records you keep under part 1904").

During discovery, OSHA asked Packers via interrogatory whether its position was that its employees were prohibited from cleaning the quill puller while it was operating (and asked that the company provide all facts and evidence supporting its answer). Packers responded that while its employees "generally"

5

did not clean running equipment, if such cleaning were necessary then employees were supposed to "maintain a sufficient distance" from the equipment. The company's response also referenced its lockout and tagout policy (which explains the process for turning off a machine and safely detaching it from any power source). The lockout policy stated that two feet from the point of operation was a "safe distance" for cleaning running equipment.[2]

The parties proceeded to a hearing, at which a Packers employee testified that the injured employee was *required* under the lockout policy to lock out the machine before cleaning it. The Secretary objected to the testimony, claiming that Packers' position constituted unfair surprise in light of Packers' interrogatory response—which had identified a two-foot safe distance rule for employees that cleaned running equipment. The ALJ overruled the objection.

During the hearing, Packers made the argument that Bennett's visit to Pilgrim's Pride could not count as an inspection of a "workplace"—because none of Packers' employees were actively working at the time of the inspection. Packers also objected to the walking–working surfaces citation, arguing that: (1) the orange cones eliminated the hazard; (2) there was no evidence that Packers

---

[2] OSHA has a standard that requires locking out certain pieces of dangerous equipment. *See Sec'y, U.S. Dep't of Labor v. Action Elec. Co.*, 868 F.3d 1324, 1328 (11th Cir. 2017) (the lockout standard "covers the servicing and maintenance of machines and equipment in which the unexpected energization or start up of the machines or equipment, or release of stored energy could cause injury to employees" (quoting 29 C.F.R. § 1910.147(a)(1)(i)).

had knowledge of a hazardous condition; and (3) there was no evidence that any employees were exposed to the condition.  Packers argued that they could not be held liable for the quill puller accident itself because the employee committed unpreventable misconduct by violating the lockout policy.  Packers concluded by explaining that it did not believe that it should be found responsible for a failure to provide the appropriate incident log because it provided the log that was onsite and OSHA had not specifically requested "current" logs.

The ALJ affirmed each of the violations.  In the ALJ's written decision, she changed her prior ruling on the testimony regarding whether the lockout policy mandated locking out before cleaning the machine and struck it for unfairly surprising the Secretary.  She otherwise found that Packers was responsible for each of the three violations.  Because the Commission declined to review the decision, the ALJ's decision became a final order of the Commission.  29 U.S.C. § 661.  Packers now appeals.

## II.

"Commission decisions are entitled to considerable deference."  *Quinlan v. Sec'y, U.S. Dep't of Labor*, 812 F.3d 832, 837 (11th Cir. 2016).  We will uphold the Commission's findings of fact so long as they are "supported by substantial evidence on the record considered as a whole."  *Id.* (quoting *ComTran Grp., Inc. v. U.S. Dep't of Labor*, 722 F.3d 1304, 1307 (11th Cir. 2013)).  We will uphold the

Commission's legal conclusions so long as they are not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Id.* (quoting 5 U.S.C. § 706(2)(A)).  Neither party disputes that we review the ALJ's decision whether to admit or exclude evidence for abuse of discretion.  *Cf. Morro v. City of Birmingham*, 117 F.3d 508, 513 (11th Cir. 1997) (district court's evidentiary decisions are reviewed for abuse of discretion).

## III.

We begin by addressing whether each of the citations resulted from an inspection of a "workplace."  The Secretary is authorized "to enter without delay and at reasonable times any factory, plant, establishment, construction site, or other area, workplace or environment where work is performed by an employee of an employer" to inspect and investigate.  29 U.S.C. § 657 (a)(1), (2).  We agree with the ALJ that "nothing in the Act or OSHA case law requires employees to be actively working on a site at the time of an OSHA inspection for a location to be deemed a workplace of their employer."  Packers' alternative interpretation—that the inspection needed to take place while Packers employees were actively working—ignores the statute's clear statement that an inspection may take place "during regular working hours *and at other reasonable times*."  *Id.* § 657 (a)(2) (emphasis added).  And while Packers points out that Pilgrim's Pride controlled the

8

workplace before the Packers workers began their shift, the cited conditions did not change during the transition between the two workforces.

We next turn to each of the ALJ's determinations that Packers violated an OSHA safety standard.  The Secretary makes out a prima facie case that an OSHA standard was violated by showing "(1) that the regulation applied; (2) that it was violated; (3) that an employee was exposed to the hazard that was created; and importantly, (4) that the employer 'knowingly disregarded' the Act's requirements."  *ComTran Grp., Inc.*, 722 F.3d at 1307 (citation omitted).  If "the Secretary shows that a supervisor had either actual or constructive knowledge of the violation, such knowledge is generally imputed to the employer."  *Id.*

### A.

We uphold the ALJ's determination that Packers violated the OSHA standard for safe walking–working surfaces.  Packers was required to ensure that walking–working surfaces "inspected, regularly and as necessary, and maintained in a safe condition."  29 C.F.R. § 1910.22(d)(1).  Packers argues that the ALJ erred in finding that the company violated that regulation because there was no evidence that any employees were exposed to the hazard; because the orange cones alleviated the hazard; and because Packers lacked the ability to repair the drain covers (as the drains were owned by Pilgrim's Pride).  The evidence before the ALJ, however, included a statement from an employee that he had previously

stepped over the drains while working.  A Packers supervisor also explained that while the orange cones near the drains alerted employees to be cautious, there was no rule against stepping over the inadequately covered drains.  That evidence suffices to support the conclusion that Packers' employees were exposed to the hazard.  The statement by the supervisor regarding the placement of cones near the hazards also suffices to impute knowledge of the hazard to the company.  *See id.*

The fact that Packers does not itself own the drains does not eliminate its responsibility to provide its employees with a safe working space.  *See Cent. of Georgia R.R. Co. v. Occupational Safety & Health Review Comm'n*, 576 F.2d 620, 624 (5th Cir. 1978) ("[A]n employer may not contract out of its statutory responsibilities under OSHA.").[3]  We conclude that sufficient evidence supported the ALJ's findings underlying its conclusion that Packers violated the safe walking–working surfaces regulation.

### B.

We also uphold the ALJ's determination that Packers violated the machine guarding standard.  Packers was required to provide "one or more methods of machine guarding" to "protect the operator" from hazards such as "ingoing nip points."  29 C.F.R. § 1910.212(a)(1).  The Commission has held that for the

---

[3] We have adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

Secretary to establish that employees are exposed to a hazardous nip point, the Secretary must show "that it is reasonably predictable either by operational necessity or otherwise (including inadvertence), that employees have been, are, or will be in the zone of danger." *See Southern Hens, Inc. v. Occupational Safety & Health Review Comm'n*, 930 F.3d 667, 679 (5th Cir. 2019) (quoting *Fabricated Metal Prods. Inc.*, 18 BNA OSHC 1072 (No. 93-1853, 1997), 1997 WL 694096, at *3). Under that standard, which Packers agrees is the correct one, entry into the zone of danger must be "reasonably predictable," not merely theoretical. *See id.* The "Commission has long held" that the machine guarding standard "requires physical guarding" and permits "guarding by distance only when physical guards or barriers are infeasible." *Id.* (internal quotation mark omitted). Packers does not contend that physical guarding was infeasible.

The quill puller's two augurs form an ingoing nip point. Sufficient evidence supported the ALJ's finding that, due to operational necessity, it was reasonably predictable that an employee would enter the zone of danger near that nip point. The injured employee in this case was tasked with hosing down the quill puller to knock off larger pieces of debris. There was no external line or barrier marking a two-foot distance from the machine—the safe distance that Packers identified. Nor was there a hard physical barrier preventing the employee from accessing the nip

11

point.  As such, the ALJ was entitled to conclude that it was reasonably predictable that the employee would inadvertently veer too close to the nip point.

Packers' argument that the employee would have faced no danger had he observed the two-foot rule is likewise unsuccessful.  To the extent that it seeks to blame the injured employee for failing to follow that rule, Packers misses the mark. The machine guarding standard would mean little if a company could escape responsibility merely by reminding its employees to stay a safe distance from dangerous machines.  After all, "common human errors such as neglect, distraction, inattention or inadvertence," which might cause an employee to enter the zone of danger, are part of the basis for the standards in the first place.  *See id.* at 677 (citation omitted) (internal quotation marks omitted).

Packers argues that it is nevertheless entitled to the affirmative defense of unpreventable employee misconduct because the injured employee violated a mandatory rule that the machine should be locked out and inoperative before it was cleaned.  Resolving this issue requires considering the ALJ's decision to strike Packers' testimony at the hearing that any such rule existed.  We conclude that the ALJ did not abuse its discretion in excluding the testimony.  Packers' response to the Secretary's clearly worded interrogatory indicated a "general" preference that machines not be cleaned while in operation—but that if they were, then employees

should remain two feet clear from the machine.[4]  The clear implication of Packers' response was that the company did not have an absolute prohibition against cleaning machines in operation.  Packers' new testimony regarding the lockout policy at the hearing, however, indicated that there was such a prohibition.  It was not an abuse of discretion for the ALJ to exclude that testimony—which effectively reversed Packers' interrogatory answer—due to the unfair surprise it worked upon the Secretary.[5]  *Cf. Weeks v. Remington Arms Co.*, 733 F.2d 1485, 1491 n.11 (11th Cir. 1984) (explaining that evidence may excluded under Rule 403 where it would create unfair surprise).

Absent an appropriate rule, Packers cannot make out the defense of unpreventable employee misconduct.  To establish that affirmative defense, an employer must show that it "1) has established work rules designed to prevent the violation, 2) has adequately communicated these rules to its employees, 3) has taken steps to discover violations, and 4) has effectively enforced the rules when violations have been discovered." *Southern Hens, Inc.*, 930 F.3d at 678 (citation omitted).  Evaluating whether an employer has established this defense will often overlap with the merits inquiry of a violation—as it does here.  *See id.*  Without the

---

[4] While Packers' response to the interrogatory provided the lockout policy as a relevant document, the policy itself did not clearly explain whether lockout occurred before the first knockdown or before the second, fine-tuned cleaning.

[5] Nor was it error for the ALJ to consider testimony from Packers' expert that it eventually excluded as evidence for the separate purpose of determining whether the Secretary was given adequate notice of Packers' defense.  *See* 5 U.S.C. § 556(e).

stricken testimony, Packers is left arguing that the injured employee violated the proximity rule.  But the relevant inquiry is whether the employee caused the violation—not whether the employee could have avoided injury despite the employer's violation.  *See id.* ("The departure from OSHA standards, not the worker's injury, is the violation.").

The only remaining issue as to the machine guarding standard, then, is whether Packers was aware of the dangerous condition.  The ALJ had sufficient evidence to conclude that the company was aware of the hazard.  Supervisors walked past the quill puller regularly and could easily see that it lacked the necessary physical guards.  Sufficient evidence supported the ALJ's findings underlying its conclusion that Packers violated the machine guarding standard.

## C.

Finally, we affirm the ALJ's determination that Packers committed an other-than-serious violation of 29 C.F.R. § 1904.40(a), a regulation which requires employers to provide OSHA with copies of the records they "keep under part 1904" within four business hours if OSHA requests them.  Packers' argument that they were only required to produce the records that were onsite at the time of the request conflicts with the regulatory scheme, as the very next section of the regulation explains how a company may calculate its deadline to produce the records if it keeps them in another time zone.  *See id.* § 1904.40(b)(2).  And while

14

Packers suggests that OSHA did not specifically use the word "current" when it requested the records, the basic requirement that a company update its log after an accident means that any request for the records kept "under part 1904" is a request for current records.

**PETITION DENIED.**