[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-15792
Non-Argument Calendar
_____

Agency No. 12-1496

SECRETARY, U.S. DEPARTMENT OF LABOR,

Petitioner,

versus

ACTION ELECTRIC COMPANY,

Respondent.

_____

Petition for Review of a Decision of the
Occupational Safety and Health Review Commission

_____

(July 13, 2017)

Before TJOFLAT, WILLIAM PRYOR, and ROSENBAUM, Circuit Judges.

PER CURIAM:

The Secretary of Labor files this petition pursuant to 29 U.S.C. § 660(a) for

review of a final order of the Occupational Safety and Health Review Commission.

The Commission adopted the decision of an administrative law judge ("ALJ") vacating the Secretary's citation of Respondent Action Electric Company under 29 C.F.R. § 1910.147, which provides a standard for control of hazardous energy during servicing and maintenance of machines and equipment. For the reasons set forth below, we grant the Secretary's petition for review, vacate the Commission's order, and remand with instructions to reinstate the Secretary's citation.

## I.

Action is a business located in Smyrna, Georgia, that provides electrical services to other businesses. Since 2004, Action has performed repair work and other services for the Gerdau Ameristeel US ("Gerdau") steel mill in Cartersville, Georgia. This case arose from the death of an Action apprentice onsite at Gerdau's mill during a visit on which he and an Action leadman had intended to replace certain fans within the mill's cooling bed. The apprentice, James Eddie Lanier, Jr., died after a counterweight within the cooling bed was de-energized and fell, striking him.

Gerdau's cooling bed is a collection of equipment that works together to cool hot rolled steel so that later it may pass through a straightener. The heated metal enters the cooling bed from a conveyor onto a set of rakes with grooves that move the steel through the bed. While the steel moves along these rakes, 110 3-foot-by-3-foot rotary fans blow air across the steel to cool it. The fans are bolted to

2

a rail found just under the surface of the bed, approximately 8 feet above a basement floor where technicians must walk to access the cooling bed's components. The basement contains a variety of equipment used to lift the cooling bed and move the rakes: drive motors, rotating shafts, counterweights, chains, drive pulleys, gear boxes, walking beams, and other equipment. Altogether, the equipment occupies a space within the mill measuring roughly 325 feet long and 100 feet wide.

When the cooling bed is in operation, the only safe place for technicians in the basement is a designated walkway marked by overhead lights, chain ropes, and yellow floor paint. Sometimes, necessary maintenance requires technicians to access other parts of the basement. To ensure the safety of technicians at those times, Gerdau requires the entire cooling bed to be "locked out." This process, which takes the mill's cooling-bed maintenance technician approximately 20 minutes to complete, involves de-energizing equipment within the cooling bed so that it does not unexpectedly move and injure persons within the basement.

Gerdau employs safety protocols requiring a series of steps to be taken before technicians can enter the cooling-bed basement to do maintenance. Technicians entering the bed must complete a work authorization permit that is not valid until lockout is complete, a successful lockout is verified, each technician

3

entering the bed affixes a personal lock to a group lockout box, and the responsible Gerdau technician signs the permit.

On the day of the accident, December 9, 2011, the two Action employees prepared to replace three of the fans in the cooling bed, which required access to the basement. Even though the Action leadman knew that the Gerdau technician responsible for locking out the bed had not completed the lockout process, the Action employees entered the basement and moved off the designated walkway. They did so without affixing their personal locks to the group lockout box or completing the work permit as required. Inside the basement, they began to discuss the work to be completed and to observe the fans in need of replacement. At that time, Gerdau's technician, who could not see the Action employees from where he was locking out the bed, began to de-energize the counterweights in the bed as part of his lockout procedure. This caused one of the counterweights to fall from an energized position and fatally strike Lanier.

## II.

The Occupational Safety and Health Act of 1970 (the "Act") "delegates broad authority to the Secretary to promulgate different kinds of standards" for the purpose of "ensuring safe and healthful working conditions for every working man and woman in the Nation." *Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 611 (1980). The standard at issue in this case, the "lockout/tagout"

4

("LOTO") standard, "covers the servicing and maintenance of machines and equipment in which the unexpected energization or start up of the machines or equipment, or release of stored energy could cause injury to employees."  29 C.F.R. § 1910.147(a)(1)(i).   Under the standard, employers must "establish a program and utilize procedures for affixing appropriate lockout devices or tagout devices to energy isolating devices, and to otherwise disable machines or equipment to prevent" injuries caused by stored energy or unexpected energization. *Id.* § 1910.147(a)(3)(i).

The Secretary is also responsible for enforcement of the LOTO standard and other regulations.  "If the Secretary (or the Secretary's designate) determines upon investigation that an employer is failing to comply with . . . a standard, the Secretary is authorized to issue a citation and to assess the employer a monetary penalty."  *Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 147 (1991) (citing 29 U.S.C. §§ 658-659, 666).  An employer wishing to contest a citation must receive an evidentiary hearing, after which the Commission renders an order—either by adopting the findings and conclusions of an ALJ or by conducting its own discretionary review of the ALJ's decision—that affirms, modifies, or vacates the citation or proposed penalty.  *Id.* at 147-48 (citing 29 U.S.C. § 659(c)).

Exercising the Secretary's enforcement authority, the Occupational Safety and Health Administration ("OSHA") investigated the fatality in this case and issued Action a citation for a serious violation[1] of 29 C.F.R. § 1910.147(f)(3)(ii)(D), for its employees' failure to "affix a personal lockout or tagout device" to a mechanism controlling the counterweights' energy before entering Gerdau's cooling-bed basement to observe the fans. Action contested the citation but did not dispute that its employees failed to affix LOTO devices. Instead, Action argued the LOTO standard was inapplicable to its employees' actions because the equipment causing the fatality, the counterweights, was not the same equipment being serviced by the employees, the fans. Action argued additionally that its employees were not working on the fans but simply viewing them, so the LOTO standard was inapplicable for that reason also. The Secretary responded that the cooling bed constituted one discrete mechanical system for the purposes of the LOTO standard. On this view, Action employees were required to control the energy of the entire cooling bed before conducting any work on the bed that would expose them to danger.

After a hearing, the ALJ issued a decision vacating the citation, based largely on Action's reasoning. *See* Decision & Order, Action Electric Co., 25

---

[1] A violation is classified as "serious" if "an employer knew about and failed to prevent 'a substantial probability that death or serious physical harm could result from a condition which exists' in the workplace." *Fluor Daniel v. Occupational Safety & Health Review Comm'n*, 295 F.3d 1232, 1239 (11th Cir. 2002) (quoting 29 U.S.C. § 666(k)).

6

BNA OSHC 2138 (No. 12-1496, 2013) (ALJ) ("ALJ Decision & Order"). The ALJ agreed with Action that the fans and counterweights were separate machines, meaning that the LOTO standard did not require control of the counterweights' energy when work was on the fans only. *Id.* at 8-11. The ALJ also ruled that the employees were not "servicing" the fans under the meaning of the regulation because the employees were too far away from the fans to be exposed to the unexpected energization of or release of hazardous energy from them. *Id.* at 11-12.

The Secretary then filed a petition for discretionary review, which the Commission granted. But because the two-person Commission could not arrive at a unanimous decision, the Commission vacated its own direction for review and adopted the ALJ's decision as its final order. *See* Action Elec. Co., 25 BNA OSHC 2120 (No. 12-1496, 2016), 2016 WL 3747113, at *1 ("Commission Decision"). The Secretary now petitions this Court for review of that final order, and we grant the petition.

## III.

We will overturn the legal determinations of the Commission "only if they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with [the] law.'" *Fluor Daniel v. Occupational Safety & Health Review Comm'n*, 295 F.3d 1232, 1236 (11th Cir. 2002) (quoting 5 U.S.C. § 706(2)(A)). The standard for disturbing the Commission's factual findings is exacting: "'if [the

7

findings are] supported by substantial evidence on the record considered as a whole, [they] shall be conclusive.'" *Id.* (quoting 29 U.S.C. § 660(a)).

## IV.

When a regulation is ambiguous, the agency's interpretation of its own regulation is entitled to deference. *Christensen v. Harris Cty.*, 529 U.S. 576, 588 (2000) (citing *Auer v. Robbins*, 519 U.S. 452, 461 (1997)).  Here, although our review is of the Commission's decision, our primary deference is not to the Commission's interpretation of the law.  Rather, we must accept as controlling the Secretary's reasonable interpretations of OSHA regulations despite whether they conflict with the Commission's reading.  *Martin*, 499 U.S. at 156, 158 ("Giving the Commission the power to substitute its reasonable interpretations for the Secretary's . . . would . . . clearly frustrate Congress' intent to make a single administrative actor accountable for the overall implementation of the Act's policy objectives . . . .") (internal quotation marks omitted).

## A.

The first question we decide is whether the LOTO standard required Action employees to control the stored energy in the counterweights before entering the cooling-bed basement to work on the fans.  As the ALJ explained, "There is no dispute that servicing and maintenance work on the fans would require compliance with LOTO.  The issue is whether the LOTO requirements apply to the

8

counterweights if the servicing and maintenance work is only on the fans."  ALJ Decision & Order at 7.

To answer this question, we must determine whether the cooling bed is one "machine" for the purposes of the LOTO standard.    *See* 29 C.F.R. § 1910.147(a)(1)(i) ("This standard covers the servicing and maintenance of machines and equipment in which the . . . release of stored energy could cause injury to employees.").    If the components of the cooling bed are together considered one "machine," then failure to follow the standard with respect to one component of the bed—the counterweights causing the death—is grounds for a citation even though Action's employees were servicing a different component of the bed—the cooling fans.  Because the Secretary's regulations lack any definition of "machine," the primary text of 29 C.F.R. § 1910.147 is too ambiguous to establish whether Gerdau's cooling bed is altogether one "machine."  So we must look to the Secretary's interpretation of the word in the regulation to determine if it is reasonable.  *See Martin*, 499 U.S. at 156, 158.

The Secretary has promulgated no authority explicitly defining the word "machine" but has issued guidance explaining that "the LOTO standard does not apply to equipment or machinery that is not the subject of the servicing and maintenance activity and that functions independently from, and is not a sub-system of, the machine/equipment being serviced or maintained."  The Control of

9

Hazardous Energy – Enforcement Policy and Inspection Procedures, CPL 02-00-147, at 1-10 (Feb. 11, 2008) (the "LOTO Directive").  Under the Secretary's interpretation, then, two pieces of equipment are part of one "machine" if they do not function independently of one another or if both are sub-systems of a larger machine.  We afford this informal guidance deference because we find it to be a persuasive interpretation of the regulation.  *See Martin*, 499 U.S. at 157 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

Relying in part on the LOTO Directive, the ALJ offered several reasons to support its conclusion that "[t]he cooling bed is not itself a machine or piece of equipment" but rather "a process that contains separate and distinct machines and equipment."  ALJ Decision & Order at 8; *see id.* at 10 (quoting the LOTO Directive).  First, "[t]he fans are not fixed nor permanently attached to the counterweights and rakes."  *Id.* at 8.  Second, "[t]he mill's written cooling bed lockout procedure shows that the various machines and equipment need to be separately locked out. . . . The omission of the fans from the written lockout procedures underscores the fact the fans operated independently of the cooling bed."  *Id.* at 9.  Third, "[t]he fans and counterweights serve different purposes and function differently, although part of the cooling bed process."  *Id.*  Finally, "[t]here are no electrical connections between the fans and drive chains that tell[] the fans to turn on when the chain drives are on."  *Id.*

Assuming for a moment that the LOTO Directive offers the most detailed available guidance from the Secretary on the LOTO standard, these observations by the ALJ would appear to be "conclusive" of our review due to the great deference we owe the Commission's findings of fact. *See Fluor Daniel*, 295 F.3d at 1236; LOTO Directive at 1-10 (framing the question as whether one of two pieces of equipment "functions independently from, and is not a sub-system of" the other).

But the Commission did not take into account an additional, more detailed, and binding source of administrative guidance that precludes the ALJ's conclusion that the fans and counterweights operated "independently":  the Secretary's briefing before the ALJ and the Commission in this very case.  When the Secretary offers interpretations of the LOTO standard or other regulations during the administrative adjudication process, those interpretations are more than just arguments by a party to an adversarial proceeding.  Even in this context, the Secretary's interpretations of its own regulations constitute "agency action" and "an exercise of the agency's delegated lawmaking powers" under the Act.  *Martin*, 499 U.S. at 157.  Indeed, "the Secretary's litigating position before the Commission is as much an exercise of delegated lawmaking powers as is the Secretary's promulgation of a workplace health and safety standard." *Id.*; *see also S.G. Loewendick & Sons, Inc. v. Reich*, 70 F.3d 1291, 1294 (D.C. Cir. 1995)

11

("[W]e defer even where the Secretary offers his interpretation in the context of litigation before the Commission.").

In his briefing before the ALJ, the Secretary interpreted the LOTO standard as applicable to all pieces of equipment that "function together as one system" when servicing or maintenance is performed on any part of that system. *See* Complainant's Post-Hr'g Br. at 22, *Action Electric Co.*, 25 BNA OSHC 2138 (No. 12-1496, 2013) (ALJ) ("ALJ Br."). The Secretary further elucidated his interpretation by responding to Action's arguments within his brief. Action had argued that the cooling bed was a collection of independently functioning equipment just like the machinery at issue in another Commission case, *The Timken Co.*, 20 BNA OSHC 1070 (No. 97-0970, 2003), 2003 WL 1889150, at *1 ("*Timken*"). We pause here to address *Timken* because, although *Timken* itself is in no way binding on this Court's decision,[2] a review of the facts and Commission

_____

[2] In its final decision, the Commission refers to the "precedential value" of its own decisions. *See* Commission Decision, 2016 WL 3747113, at *1. But "precedent" is somewhat of a misnomer, at least with regard to governing interpretations of OSHA regulations. "[T]he Commission is authorized to review the Secretary's interpretations for only consistency with the regulatory language and for reasonableness. In addition, of course, Congress expressly charged the Commission with making authoritative findings of fact and with applying the Secretary's standards to those facts in making a decision." *Martin*, 499 U.S. at 154-55. This delegation of power is much more limited than that to an adjudicatory body in an agency with a unitary structure, where "adjudication operates as an appropriate mechanism not only for factfinding, but also for the exercise of delegated lawmaking powers, including lawmaking by interpretation." *Id.* at 154. So although this Court owes deference to an interpretation of the regulation that borrows language from *Timken*, this is so only because the Secretary chose to incorporate the language in his own guidance. *See* LOTO Directive at 1-10.

decision in that case is helpful as background to the Secretary's promulgation of new guidance on the LOTO standard in its briefing before the agency.

In *Timken*, a steel-mill employee was injured while servicing a teeming car, which is a vessel that transports steel molds around a mill on top of a motorized unit called a traverser. The employee suffered her injury because her feet were too close to the traverser, which had not been locked out or tagged out prior to her work on the inactivated teeming car. *Timken*, 2003 WL 1889150, at *1. In reviewing the Secretary's citation for a violation of the LOTO standard, the Commissioners in *Timken* agreed that the LOTO standard did not apply to the failure to lock out the traverser while the employee was servicing the teeming car. One Commissioner wrote that the teeming car and traverser "functioned independently" and that the Secretary failed to show they were "permanently interconnected in a single, integrated system"; the other adopted this analysis and noted additionally that mill operations continued normally on the day of the accident, including "the movement of the other teeming cars onto the traverser." *Id.* at *4, *9.

By distinguishing the facts of *Timken* in his brief before the ALJ, the Secretary clarified his interpretation of the LOTO standard. In this case, "the various parts of the cooling bed . . . function together to perform th[e] process of cooling the steel." ALJ Br. at 25. Although it could be said that the traverser and

13

teeming car in *Timken* also "function together to perform [a] process," the Secretary then made one additional, crucial distinction: in *Timken*, "the traverser had other functions," whereas here, the various components of the cooling bed served no other purpose. *Id.* at 26. Incidentally, this distinction echoes the conclusion of one of the *Timken* Commissioners that it was not sensible to apply the LOTO standard in that case because the traverser was able to serve other purposes while the teeming car being serviced was inactive. *See Timken*, 2003 WL 1889150, at *9.

After the ALJ ruled against the Secretary, the Secretary reiterated this exclusive-function analysis before the Commission.[3] Framing the operative question as whether "separate machine components function together as a single integrated system," the Secretary again noted that "the counterweights, fans and other cooling bed sub-systems all operated *simultaneously* to execute the cooling process," unlike the traverser in *Timken*, which "moved on to another assignment" once it completed its work with any one teeming car. Acting Sec'y of Labor's Pet. for Discretionary Review at 7, 10, Action Electric Co., 25 BNA OSHC 2120 (No.

---

[3] The Secretary also argued before the Commission that "assessing whether the cooling bed is a single integrated system for LOTO purposes requires evaluating the cooling bed's configuration . . . , and whether servicing the cooling fans exposed workers to the unexpected energization of, or release of hazardous energy from, other parts of the cooling bed." Opening Br. for the Sec'y of Labor at 10, Action Electric Co., 25 BNA OSHC 2120 (No. 12-1496, 2016). In essence, the Secretary's position was that the danger posed by one piece of equipment due to its proximity to another piece of equipment being serviced is relevant to the determination whether the two pieces of equipment constitute a "machine."

14

12-1496, 2016) (emphasis added) (internal quotation marks omitted); *see also* Opening Br. for the Sec'y of Labor at 13, Action Electric Co., 25 BNA OSHC 2120 (No. 12-1496, 2016) ("[U]nlike the traverser in *Timken*, the counterweights and other cooling bed components did not perform other functions during fan servicing and maintenance."). So in sum, under this interpretation, a "machine" is made up of components that serve no other purpose besides the one they accomplish together when operating simultaneously.

These observations by the Secretary amount to "agency action" to clarify the scope of the LOTO standard.[4] *See Martin*, 499 U.S. at 157. In making them, the Secretary made clear he was not merely disputing the ALJ's version of the facts; he argued that "[r]ejecting the ALJ's approach" to interpreting the regulation was "essential to preserving a meaningful distinction between a single integrated system[] and machinery and equipment that truly operate independently." *Id.* at 11.

_____

[4] In his initial brief, the Secretary takes the position that two pieces of equipment form a "machine" for the purposes of the LOTO standard "if they are permanently interconnected in a single integrated system and neither can serve its intended function without the other." Secretary's Initial Br. at 16. Although the Secretary characterizes this particular test for whether two pieces of equipment are a "machine" as "longstanding," there is no indication in the record that the Secretary has used this particular language in any administrative adjudication or other formal or informal guidance. We owe no deference to an interpretation of the law advanced for the first time before this Court. *See Martin*, 499 U.S. at 156. Nevertheless, as we explained above, we think the Secretary made various statements articulating a very similar interpretation of the LOTO standard during administrative proceedings below. Those statements during the administrative adjudication process are the focus of our analysis.

This new interpretation of the LOTO standard deserves deference if reasonable. But the ALJ—and by extension, the Commission—failed to address the Secretary's precise distinction at all. The ALJ analyzed only whether the fans and counterweights could function mechanically without the other, *i.e.*, whether each could be turned on and off independently. By adopting the ALJ's decision, the Commission thus failed to consider the Secretary's more precise question: whether the fans and counterweights each served any purpose in isolation while the other equipment was inactive. The Commission should have analyzed whether this was a reasonable way to determine if two pieces of equipment "function[ed] independently" for LOTO purposes. We now address this question.

Having carefully considered the Secretary's test for whether some equipment functions independently from other equipment—and thus constitutes a distinct "machine"—we find it to be reasonable. We note that

> the Secretary's interpretation is not undeserving of deference merely because the Secretary advances it for the first time in an administrative adjudication. But . . . the decision to use a citation as the initial means for announcing a particular interpretation may bear on the adequacy of notice to regulated parties, on the quality of the Secretary's elaboration of pertinent policy considerations, and on other factors relevant to the reasonableness of the Secretary's exercise of delegated lawmaking powers.

*Martin*, 499 U.S. at 158 (citations omitted).    We conclude the Secretary's interpretation is in line with the goals of the Act and accompanying regulations, and regulated parties had adequate notice of this interpretation.

The Act's purpose is straightforward:  "'to assure so far as possible safe and healthful working conditions' for 'every working man and woman in the Nation.'" *Georgia Pac. Corp. v. Occupational Safety & Health Review Comm'n*, 25 F.3d 999, 1004 (11th Cir. 1994) (quoting 29 U.S.C. § 651(b)).  The LOTO standard serves that goal by requiring employers to "disable machines or equipment to prevent unexpected energization, start-up or release of stored energy in order to prevent injury to employees."    29 C.F.R. § 1910.147(a)(3)(i).  As a single mechanical system grows more complex, the risk of injury the system poses for employees servicing its components grows or becomes more uncertain.  To consider a single complex mechanical system a "machine" under the LOTO regulation—even if its components are not tightly and permanently connected—accomplishes the central purpose of the regulation, which is to minimize foreseeable harms arising from energized machinery.  Because the Secretary's interpretation covers equipment that poses a serious, foreseeable risk to employees whenever they fail to lock it out, we conclude that the interpretation "sensibly conforms to the purpose and wording of the regulations." *Martin*, 499 U.S. at 151 (internal quotation marks omitted).

That being said, we do not think the Secretary's interpretation to be so broad that employers lack sufficient notice of their obligations. In advancing this interpretation, the Secretary has further clarified, rather than departed from, the guidance he has already provided. Employers were already aware, in light of the LOTO Directive, that the Secretary intended to enforce the LOTO standard in cases where injurious machinery did not "function[] independently" of machinery being serviced. In light of this guidance, it is reasonable to maintain LOTO protocols reflective of the various dangers that a complex mechanical system could create, regardless of whether different parts of that system could be powered on and off independently.

Indeed, Gerdau's protocols called for the entire cooling bed to be locked out whenever technicians serviced any part of the bed. In the words of the Gerdau technician responsible for locking out the cooling bed,

> The reason for locking out the entire equipment is accidents. Going in and out, you will have to cross different pieces of equipment, plus once you're working on a certain piece of equipment, they overlap so much that you can't work on one specific piece without locking out other equipment as well.

H'rg Tr. at 322-23, Action Electric Co., 25 BNA OSHC 2138 (No. 12-1496, 2013) (ALJ). This type of judgment is intuitive to a technician familiar with the machinery for which he is responsible. Equally intuitive is the judgment that

18

Gerdau need not shut down its entire factory to ensure safety during servicing of the cooling bed alone.

We therefore disagree with one Commissioner's concern that, under the Secretary's interpretation, "it is impossible to discern where a machine begins and ends," with the result that an employer might be required to lock out its entire factory to perform any maintenance at all. *See* Commission Decision, 2016 WL 3747113, at *15. It is hard to imagine employers locking out machinery that poses no foreseeable risk whatsoever to technicians servicing other equipment—perhaps due to the lack of any physical proximity—simply for fear of a reviewing court's convoluted theory that the two constitute a single machine because they are both part of an overall production process. Any such application of the LOTO standard undoubtedly would be considered unreasonable.

But we also think the Secretary's interpretation is well-enough defined to give employers adequate notice of their responsibilities from this point forward. The defining question is whether equipment being serviced has any purpose apart from its simultaneous operation with equipment creating danger from unexpected energization or release of stored energy, and vice versa. Here, Gerdau's cooling bed can perform a useful task in the production process—cooling steel billets— even if other parts of the production process are inactive. That is, the various

19

production processes within one steel mill need not be active *simultaneously* to achieve progress in production. So the cooling bed is one "machine."

In contrast, neither the fans nor the counterweights serve any purpose at all if the other is inactive. If the counterweights move without active fans, then the steel billets simply move without being cooled. If the fans are active without the counterweights moving, then the steel billets are not cooled as intended. Neither the fans nor the counterweights can perform useful work in isolation. So the counterweights and fans are not independent "machines" but are rather sub-systems of the same "machine." Employers can apply this analysis reliably anytime they are servicing a particular piece of equipment and must decide which other equipment to lock out to comply with the LOTO standard.

In sum, we think employers, who must make frequent and expert judgments about workplace safety to quell the regulatory and liability concerns they face, are capable of determining the appropriate scope of their LOTO protocols. This is true particularly now that the Secretary has explained with more granularity which complex mechanical systems will be considered one "machine." Accordingly, we hold that the interpretation of the LOTO standard offered by the Secretary in administrative proceedings below is reasonable.

The Commission's final decision failed to address, much less apply, this reasonable interpretation. Under this interpretation, Gerdau's cooling bed is one

20

"machine," and the LOTO regulation required lockout of its counterweights while its fans were being serviced.

## B.

We now decide whether the Action employees were "servicing" or performing "maintenance" on the cooling bed at the time of the accident. *See* 29 C.F.R. § 1910.147(a)(2)(i). We conclude that the LOTO standard applied to the Action employees' activities because they were workplace activities directed at the cooling bed that exposed the employees to the release of hazardous energy from the cooling bed.

The LOTO regulation defines "servicing and/or maintenance" as "[w]orkplace activities such as constructing, installing, setting up, adjusting, inspecting, modifying, and maintaining and/or servicing machines or equipment." 29 C.F.R. § 1910.147(b). The regulation then clarifies that "[t]hese activities include lubrication, cleaning or unjamming of machines or equipment and making adjustments or tool changes, where the employee may be exposed to the unexpected energization or startup of the equipment or release of hazardous energy." *Id.*

During administrative proceedings below, the Secretary took the position that the Action employees' observation of the fans qualified as both "setting up" and "inspecting" under the meaning of the regulation. ALJ Br. at 17-20; *see* 29

C.F.R. § 1910.147(b) (defining "[s]etting up" as "[a]ny work performed to prepare a machine or equipment to perform its normal production operation"). We agree, but we do not think this issue necessarily turns on the definition of each of the examples of "[w]orkplace activities" enumerated in the regulation. The clear thrust of the regulation is broadly to ensure safety where an employee performs legitimate workplace activities directed at the relevant machine and "where the employee may be exposed to the unexpected energization or startup of the equipment or release of hazardous energy." *See* 29 C.F.R. § 1910.147(b) (listing examples of workplace activities using the phrase "such as"); *Otis Elevator Co. v. Sec'y of Labor*, 762 F.3d 116, 123 (D.C. Cir. 2014) (finding the application of the LOTO standard to "unjamming" work to be expressly contemplated by the text of the regulation but also broadly in line "with the standard's preventative purpose").

The Action employees' activities easily fall into this category. According to undisputed testimony, the employees were observing the cooling-bed fans to decide which fans were going to be replaced and where to begin working. No matter whether this activity was "inspecting," "setting up," or something else productive, it was the kind of workplace activity that the regulation sought to cover

22

because it was directed at the relevant machine and exposed the employees to the release of hazardous energy outside of normal production operations.[5]

Although Action argues that the "employees were simply looking at the fans from 7 or 8 feet away, trying to determine what they were going to do," this statement effectively acknowledges that the employees were engaged in a work-related activity that facilitated further maintenance. *See* Action's Br. at 19-20. As far as we can tell, the purpose of the definition given for "servicing and/or maintenance" is not to carve out a narrow set of activities deserving of the protection of the LOTO standard; it is to make clear that the regulation applies to legitimate work-related activities directed at a given machine that expose an employee to the release of hazardous energy from that machine outside of normal production operations. Accordingly, we conclude that the LOTO standard applied to the Action employees' observation of the cooling-bed fans.

## V.

For these reasons, the Secretary's petition for review is **GRANTED**. We **VACATE** the ruling of the Commission adopting the ALJ's decision and

---

[5] The ALJ concluded that the Action employees were not servicing the fans because they were not exposed to the unexpected energization of or release of hazardous energy from the fans themselves (as opposed to from the "machine"). *See* ALJ Decision & Order at 12. Because we conclude today that the relevant "machine" for the purposes of applying the LOTO standard is the entire cooling bed, this finding by the ALJ cannot support its conclusion that the employees were not engaging in "servicing and/or maintenance."

23

**REMAND** the case to the Commission with instructions to reinstate the Secretary's citation.