*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ARGENT INTERNATIONAL, INC.,

        Plaintiff-Appellant,

v

MICHIGAN OCCUPATIONAL SAFETY &
HEALTH ADMINISTRATION,

        Defendant-Appellee.

UNPUBLISHED
March 26, 2026
11:53 AM

No. 367576
Ingham Circuit Court
LC No. 23-000171-AA

Before: O'Brien, P.J., and MURRAY and LETICA, JJ.

PER CURIAM.

Plaintiff, Argent International, Inc., appeals as on leave granted[1] the circuit court's order affirming the amended decision of the Board of defendant, Michigan Occupational Safety and Health Administration (MIOSHA), after it upheld two citations that were issued to Argent after one of its employees injured his arm in a press machine. The employee had been adjusting the way that a sticky material fed into the press by reaching beyond the press's safety gate when the roller bar that was used to feed the material descended onto his arm. Argent provided safety blocks that would have prevented the roller bar from fully descending, but the use of the blocks was not outlined in the machine-specific guidelines that Argent had created for the press, and the employee was not using the blocks at the time he was injured.

After an investigation, MIOSHA issued two occupational-safety-related citations. The first citation (Instance A) was based on the employee's failure to lockout the press before reaching beyond the gate to straighten the material. The second citation (Instance B) was based on Argent's failure to identify or provide a control device for the gravity-related hazard in the press's machine-specific procedures. On appeal, Argent challenges the legal basis for each citation and argues that

---

[1] *Argent Int'l, Inc v MI Occupational Safety & Health Admin*, ___ Mich ___, ___ (2024) (Docket No. 167136).

neither was supported by sufficient evidence.  We affirm the circuit court's order upholding the citations.

## I.  BACKGROUND

The Occupational Safety and Health Standards section of the Code of Federal Regulations requires an employer to control hazardous energy related to the servicing or maintenance of machines and equipment:

> This standard covers the servicing and maintenance of machines and equipment in which the unexpected energization or start up of the machines or equipment, or release of stored energy could cause injury to employees.  This standard establishes minimum performance requirements for the control of such hazardous energy.  [29 CFR 1910.147(a)(1)(i).]

This section, which is also referred to as Part 85,[2] requires an employer to establish a program and procedures to "affix[] appropriate lockout devices or tagout devices to energy isolating devices, and to otherwise disable machines or equipment to prevent unexpected energization, start-up or release of stored energy in order to prevent injury to employees."  29 CFR 1910.147(a)(3)(i).  Although 29 CFR 1910.147 refers to lockout or tagout devices, the parties in this case address only lockout devices.  A lockout device is "[a] device that utilizes a positive means such as a lock, either key or combination type, to hold an energy isolating device in a safe position and prevent the energizing of a machine or equipment."  29 CFR 1910.147(b).  A lockout device prevents the machine from being operated until the device is removed.  29 CFR 1910.147(b).

The citations concerned Argent's Sheridan press.  Argent's maintenance manager testified that the press handled multiple materials, which the roller bars fed into it from rolls.  The front roller rose up out of the way when not in use, and if the rear roller was being used, the front roller would be in an upright position.  A control panel existed specifically to operate the roller bar and gate.  The supervisor of the injured employee testified that the materials used in the press are very sticky and sometimes need to be removed from the die.  According to the supervisor, it was normal for materials to come out of alignment during production, and this occurrence happened daily and depended on the material's shape and texture.

The supervisor and maintenance manager both testified that grabbing tools could be used to reach inside the machine.  However, the supervisor testified that small adjustments could be made to line up the material by hand.  The supervisor also testified that the operator was instructed to not put their hands behind the safety bar or under the roller bar, but safety procedures required blocks to be used to prevent the gate and roller bar from dropping down to prevent accidents or

_____

[2] The Administrative Law Judge, MIOSHA Board of Appeals, and the parties referred to 29 CFR 1910.147, Mich Admin Code R 408.18502, and Part 85 interchangeably.  Because the Michigan Administrative Code has adopted 29 CFR 1910.147 by reference, we will simply refer to 29 CFR 1910.147 or Part 85.

injuries to the operator's hands when "some small adjustment" was required "with hands inside a little bit."

MIOSHA initiated an investigation after one of plaintiff's operators was injured while adjusting material that became crooked while he loaded it into the roller. The operator lifted the gate, reached in, and a roller bar came down onto his right forearm. The operator's supervisor testified that the operator had probably been trying to perform small adjustments to the material. The supervisor testified that employees were instructed to use safety blocks when reaching beyond the gate to adjust material, but when the supervisor arrived, the safety blocks were on the floor. The injured operator later admitted that he had not used the safety blocks, even though they had been available.

After MIOSHA investigated the incident, it issued citations on the bases that Argent had not developed a machine-specific hazardous-energy control system for the gravity-related hazard in the die area of the press (Instance A) and that the press's procedures did not identify or provide a control device for the gravity-related hazard in the die area (Instance B). At the hearings, the parties disputed whether the operator's activities had constituted servicing or maintenance under Part 85, and if so, whether the operator's activities fell within a minor-tool-change exception to the requirement to lockout the press. The Administrative Law Judge (ALJ) found that a preponderance of the evidence did not support finding that the operator's activities met the definition of servicing or maintenance under Part 85. The ALJ found that, instead, the conduct fell within the minor-tool-change exception because the task was routine, repetitive, and integral to production. The ALJ also found that, when the press's lockout procedures were followed, gravity caused the rollers to rest in the down position. However, the rollers could not come down if the pneumatic and hydraulic energy were functional, and if the lockout procedure was followed, there would be no unexpected release of the stored energy and any malfunction in the rollers would be obvious. The ALJ dismissed the citations.

MIOSHA filed objections to the ALJ's decision to the MIOSHA Board of Appeals, and the Board reversed after determining that the ALJ had failed to fully analyze the operator's activities. The Board's initial decision was sparse; it did not analyze Part 85, and although it found that a preponderance of the evidence supported the citations, it did not state what that evidence was. Argent appealed the Board's decision to the circuit court, which held that the Board's decision was legally and factually insufficient and remanded for the Board to provide a decision sufficient for appellate review.

Following remand, the Board again reversed the ALJ's decision and reinstated the citations for Instances A and B. Regarding Instance A, the Board found that the operator had been unjamming the press, which was servicing or maintenance of the press under Part 85, and that the operator's activities did not fall within the minor-tool-change exception because the adjustments were unpredictable rather than repetitive. Regarding Instance B, the Board found that a gravitational hazard existed in the press's area but Argent had not identified the hazard in its machine-specific procedures. It further found that Argent's existing procedures were not adequate to protect operators from the known hazard.

After remand, the circuit court affirmed the Board's amended decision to reinstate the citations. The circuit court found that the Board's explanations of its analysis of Part 85 were

sufficient, concise, and explicit and that its decision identified competent, material, and substantial evidence to support upholding the citations. Further, the court determined that the decision was not arbitrary or capricious. This appeal followed.

## II. STANDARDS OF REVIEW

When reviewing a circuit court's opinion regarding an administrative decision, "this Court must determine whether the lower court applied correct legal principles and whether it misapprehended or grossly misapplied the substantial-evidence test to the agency's factual findings." *Dearborn Hts Pharmacy v Dep't of Health & Human Servs*, 338 Mich App 555, 559; 980 NW2d 736 (2021) (quotation marks and citation omitted). To apply the correct legal principles, the circuit court must review the administrative record and determine whether the agency's decision was authorized by law. *Id*. This Court reviews de novo questions of law, including whether an agency's action complied with a statute and whether the agency correctly interpreted a statute or administrative rule. *Id*. at 560.

Const 1963, art 6, § 28 provides the scope of the review for an administrative agency's decisions:

> All final decisions, findings, rulings and orders of any administrative officer or agency existing under the constitution or by law, which are judicial or quasi-judicial and affect private rights or licenses, shall be subject to direct review by the courts as provided by law. This review shall include, as a minimum, the determination whether such final decisions, findings, rulings and orders are authorized by law; and, in cases in which a hearing is required, whether the same are supported by competent, material and substantial evidence on the whole record.

An agency's decision is not authorized by law "if it violates constitutional or statutory provisions[.]" *Dearborn Hts Pharmacy*, 338 Mich App at 559 (quotation marks and citation omitted). "[A]gency interpretations are entitled to respectful consideration, but they are not binding on courts and cannot conflict with the plain meaning of the statute." *In re Complaint of Rovas Against SBC Mich*, 482 Mich 90, 118; 754 NW2d 259 (2008). Respectful consideration is not the same as deference. *Id*. at 108. Instead, respectful consideration indicates that the agency's decision may be helpful when construing a provision with a doubtful or obscure meaning. *Grass Lake Improvement Bd v Dep't of Environmental Quality*, 316 Mich App 356, 363; 891 NW2d 884 (2016).

## III. WAIVER AND ISSUE PRESERVATION

On appeal, Argent argues that the operator's activities of loading material into the press or unjamming it do not constitute operating the machine during production, and as a result, Part 85 is entirely inapplicable to the operator's conduct. This case presents an interesting procedural posture because Argent was not the party that objected to the ALJ's proposed decision but is the party that appealed the Board's decision to the circuit court. We conclude that Argent has not waived the issue of the general application of Part 85 to this case because, in response to MIOSHA's objections, Argent generally argued that the ALJ's decision was legally sufficient and

should be upheld. However, we conclude that Argent has failed to properly preserve the issue for this Court's review by failing to specifically raise it before the circuit court.

To avoid waiving an issue when appealing an administrative agency's decision to the circuit court, the party must challenge the ALJ's proposed decision with a specific objection. *Meier v Pub Sch Employees' Retirement Sys*, 343 Mich App 571, 579; 997 NW2d 719 (2022). If the party fails to do so, it will waive the issue, which precludes appellate review. *Id*. In addition, to preserve an issue for this Court, the party must raise the issue before the lower court. *Glasker-Davis v Auvenshine*, 333 Mich App 222, 227; 964 NW2d 809 (2020).[3] This preservation requirement exists so that litigants will raise issues before the lower courts, thus preventing errors, eliminating prejudice, and creating records. *Id*. at 228.

In this case, the ALJ determined that, at the time of the accident, the operator's conduct did not meet the definition of servicing or maintenance, and therefore Part 85 did not apply. MIOSHA objected to the proposed decision on the basis that the operator had been setting up the press, and Argent countered that the ALJ's decision was well-reasoned and supported by law. The Board ultimately reversed the ALJ's decision, ruling that the operator had been servicing the press by setting up the press. We conclude that, because Argent was not the party objecting to the proposal for decision and argued generally that the ALJ's decision should be upheld, Argent has not waived any issues.

However, this does not render Argent's issues entirely preserved. In this case, the circuit court had plenary appellate review of the final decision of MIOSHA's Board. See MCR 7.103. Following the Board's decision, Argent did *not* argue before the circuit court that Part 85 did not apply to the operator's actions on the basis that he had not been servicing or maintaining the press. Instead, Argent argued only that the Board had misapplied the minor-tool-change exception and made factual errors when applying Part 85's legal standards. Because Argent did not argue before the circuit court that Part 85 is entirely inapplicable, we conclude that this issue has not been preserved for our review. However, the remainder of Argent's issues on appeal are preserved.

Further, Argent asks us to determine whether the Board's decision sufficiently identified the legal authority, testimony, exhibits, or portions of the record to support its findings of fact or conclusions of law. We conclude that the circuit court properly applied the law when determining that the Board's decision was sufficient.

The Administrative Procedures Act of 1969 (APA), MCL 24.201 *et seq*., requires that the final decision of an administrative agency contain findings of fact and conclusions of law sufficient to facilitate appellate review:

> A final decision or order of an agency in a contested case shall be made, within a reasonable period, in writing or stated in the record and shall include findings of fact and conclusions of law separated into sections captioned or entitled

---

[3] We emphasize that even though recent opinions of this Court have continued to refer to a "raised, addressed, *and* decided" standard, this standard is not consistent with our Supreme Court's precedent because an issue need only be raised. See *Glasker-Davis*, 333 Mich App at 227.

"findings of fact" and "conclusions of law", respectively. Findings of fact shall be based exclusively on the evidence and on matters officially noticed. Findings of fact, if set forth in statutory language, shall be accompanied by a concise and explicit statement of the underlying facts supporting them. If a party submits proposed findings of fact that would control the decision or order, the decision or order shall include a ruling upon each proposed finding. Each conclusion of law shall be supported by authority or reasoned opinion. [MCL 24.285.]

But again, this Court's review is limited to whether the circuit court applied incorrect legal principles or misapprehended or grossly misapplied the substantial-evidence test when reviewing the Board's decision. *Dearborn Hts Pharmacy*, 338 Mich App at 559-560.

In this case, the circuit court specifically considered and applied MCL 24.285. It concluded that the Board's decision was concise but sufficient in its factual findings and application of law. After the circuit court's initial remand, the Board's decision addressed those provisions of Part 85 necessary to explain its conclusions and the factual bases supporting its decision to reinstate both citations. The circuit court did not incorrectly apply MCL 24.285. Further, the Board's decision is sufficient for the purposes of our review.

## IV. GENERAL APPLICATION OF PART 85

As previously discussed, Argent did not preserve its argument that Part 85 does not apply to the operator's actions on the basis that he had not been servicing or maintaining the press. In civil cases, if a litigant failed to raise an issue before the lower court, this Court is not obligated to consider the issue. *Tolas Oil & Gas Exploration Co v Bach Servs & Mfg, LLC*, 347 Mich App 280, 289; 14 NW3d 472 (2023). Nonetheless, this Court may address an unpreserved issue "if the failure to consider the issue would result in manifest injustice, if consideration is necessary for a proper determination of the case, or if the issue involves a question of law and the facts necessary for its resolution have been presented." *Id*. at 289-290 (quotation marks and citation omitted). It is appropriate to address this issue for two reasons. First, this issue concerns questions of law for which the facts necessary to resolve it are present in the record. Second, it is necessary to determine whether Part 85 applies to properly consider whether any exceptions to Part 85 were improperly applied.

Part 85 "covers the servicing and maintenance of machines and equipment in which the unexpected energization or start up of the machines or equipment, or release of stored energy could cause injury to employees." 29 CFR 1910.147(a)(1)(i). "This standard applies to the control of energy during servicing and/or maintenance of machines and equipment." 29 CFR 1910.147(a)(2)(i). The definition of "servicing and/or maintenance" includes setting up, adjusting, and unjamming machines or equipment:

Workplace activities such as constructing, installing, *setting up, adjusting*, inspecting, modifying, and maintaining and/or servicing machines or equipment. These activities include lubrication, cleaning or *unjamming* of machines or equipment and *making adjustments* or tool changes, where the employee may be exposed to the unexpected energization or startup of the equipment or release of hazardous energy. [29 CFR 1910.147(b) (emphasis added).]

Further, "setting up" is defined as "[a]ny work performed to prepare a machine or equipment to perform its normal production operation." 29 CFR 1910.147(b).

As with all matters of statutory interpretation, we "begin with an examination of the language of the statute." *McQueer v Perfect Fence Co*, 502 Mich 276, 286; 917 NW2d 584 (2018). This Court's goal is to give effect to the intent of the Legislature. *Sunrise Resort Ass'n, Inc v Cheboygan Co Rd Comm*, 511 Mich 325, 333; 999 NW2d 423 (2023). The language of the statute itself is the primary indication of the Legislature's intent. *McQueer*, 502 Mich at 286. When considering issues of federal law, this Court is bound by decisions of the United States Supreme Court but not those of lower federal courts. *Abela v Gen Motors Corp*, 469 Mich 603, 606; 677 NW2d 325 (2004). Even so, lower federal court decisions may be considered for their persuasive value. *Id*. at 607.

First, Argent argues that 29 CFR 1910.147 does not apply as a matter of law because the employee was a production employee, not a maintenance employee. There is no dispute that the operator was a production employee. Generally, 29 CFR 1910.147 does not apply during normal production operations. 29 CFR 1910.147(a)(2)(ii). However, 29 CFR 1910.147 does apply if the employee is required to bypass a guard, 29 CFR 1910.147(a)(2)(ii)(A), or the employee is required to place a part of the employee's body into an area "where an associated danger zone exists during a machine operating cycle," 29 CFR 1910.147(a)(2)(ii)(B). The plain language of Part 85 does not categorize employees as production or maintenance employees; it refers only to the workplace activities that an employee is performing. Accordingly, we reject the argument that the categorization of an employee is relevant to whether Part 85 applies.

Second, Argent argues that Part 85 does not apply as a matter of law because loading material into the press or adjusting it do not fall within the definitions of servicing or maintenance; instead, according to Argent, these are production operations. Again, Argent's argument fails to account for explicit statutory language regarding actions to which Part 85 applies. Part 85 applies when, during normal production operations, the employee is required to bypass a guard, 29 CFR 1910.147(a)(2)(ii)(A), or the employee is required to place a part of a body into an area "where an associated danger zone exists during a machine operating cycle," 29 CFR 1910.147(a)(2)(ii)(B). In this case, the supervisor testified that it was normal for the operator to have to adjust misaligned material during production and that the operator could make small adjustments by hand if the safety blocks were used. Accordingly, both exceptions to the production-operation exclusion apply because employees were permitted to put their hands past the safety gate, which placed them in the danger zone that was created by the roller coming down when the machine cycled.

Argent also asserts that 29 CFR 1910.147(a)(2)(ii)(B) should not apply because the operator was not required to place his hands directly into the die area of the press. Servicing or maintenance that takes place during normal production operations are only subject to 29 CFR 1910.147 if the employee must place a part of the employee's body "where work is actually performed upon the material being processed (point of operation) *or* where an associated danger zone exists[.]" 29 CFR 1910.147(a)(2)(ii)(B) (emphasis added). A machine's point of operation is "the area on a machine where work is actually performed upon the material being processed." 29 CFR 1910.212(a)(3)(i). The word "or" is a disjunctive term that refers to either action. *Ellison v Dep't of State*, 320 Mich App 169, 179; 906 NW2d 221 (2017). While we agree that the area under the roller bar was not the machine's actual point of operation, this does not lead to the

conclusion that 29 CFR 1910.147(a)(2)(ii)(B) does not apply. By its plain language, this exception applies if the employee places a part of their body into a zone of danger associated with the machine's point of operation.

This leads to Argent's next argument, which is that the roller bar was not part of the Sheridan press machine. We find federal authority persuasive when defining what the machine is for the purposes of Part 85. A machine "is made up of components that serve no other purpose besides the one they accomplish together when operating simultaneously." *Secretary, US Dep't of Labor v Action Electric Co*, 868 F3d 1324, 1332 (CA 11, 2017) (determining that fans and counterweights were part of a machine). In this case, the rollers are used to feed material into and out of the die area of the press so that the die can process the material; on their own, the rollers serve no purpose. We conclude that the roller bars are part of the machine. Accordingly, even though the operator did not have to place his hands within the die area of the Sheridan press, his placement of his hands into the operational area of the rollers put his hands in a zone of danger associated with the machine's operation.

Third, Argent argues that the Board's factual findings regarding whether the operator was setting up the press were not supported by competent, material, and substantial evidence because the machine was not set up multiple times per shift. In this case, the Board found that the preponderance of the evidence established that the operator was loading material into the press and setting up the press at the time of the injury. The plant manager testified that the operator had not been setting up the job because setup occurred before the production procedure and required the die to be pulled out. However, the supervisor referred to using the safety blocks for a setup *or* installing dies. The plant manager further opined that setup and production operations could not occur at the same time. In contrast, the MIOSHA investigator testified that the operator was engaged in setup operations at the time of his injury. The investigator described that the operator was loading a new roll when the material became crooked and opined that adding new materials was setup, so a lockout should have been performed. The circuit court did not err by determining that a reasonable mind would accept the testimony as sufficient to support the conclusion that the operator was setting up the press at the time he was injured.

Fourth, Argent argues that, as a matter of law, a person is not adjusting a press when the person is instead adjusting the material that feeds into the press. Argent's argument attempts to rely on a distinction without a difference because an adjustment concerns the relative placement of both the die and the material.

The definition of "servicing and/or maintenance" includes, among other things, "setting up, adjusting . . . or unjamming . . . ." 29 CFR 1910.147(b). This Court may consult a dictionary to determine the meaning of undefined statutory terms. *Koontz v Ameritech Servs, Inc*, 466 Mich 304, 312; 645 NW2d 34 (2002). Furthermore, a lay dictionary may be consulted to determine the meanings of common words or phrases that lack a unique legal meaning. *Sanford v State*, 506 Mich 10, 21 n 19; 954 NW2d 82 (2020). When doing so, this Court should determine the most appropriate definition in light of the word's context in the statute. *Feyz v Mercy Mem Hosp*, 475 Mich 663, 685 n 62; 719 NW2d 1 (2006).

As a verb, "adjust" is defined in pertinent part as "to bring the parts of to a true or more effective relative position." *Merriam-Webster's Collegiate Dictionary* (12th ed), p 22. And as a

noun, an "adjustment" is defined, in pertinent part, as "the act or process of adjusting," "a means (as a mechanism) by which things are adjusted one to another," or "a correction or modification to reflect actual conditions." *Id*. at 23. Additionally, when used as a verb, "jammed" means "to become wedged or stuck so as to be unworkable" or "to make (machinery) unworkable by becoming wedged or stuck." *Id*. at 859. Accordingly, it does not matter whether the employee was touching the machine or the material in order to adjust the press.

Fifth, Argent argues that the Board's factual findings that the operator was adjusting or unjamming the machine at the time he was injured were not supported by competent, material, and substantial evidence. We conclude that the evidence was sufficient to establish that the circuit court did not misapply the substantial-evidence test.

In this case, Argent's maintenance manager described a video of the incident as follows:

> . . . [T]he operator was, like, tugging in material just outside the guards. And then he reached up and turned the key switch. And as he pulled this arm away, that arm went in and momentarily he was like that.

The supervisor testified that the materials used in the Sheridan press were very sticky and sometimes required "do[ing] some small adjustment with hands inside a little bit." Witnesses testified that the material could need to be removed from the die. If the material becomes stuck to the die, it will make the die unworkable, which fits the definition of jamming the machine. The operator himself indicated that, as he began to load material, it became crooked and he reached into the machine when the roller came down onto his right forearm. The investigation report indicated that the unsecured roller dropped about six inches down onto the operator's hand or arm. We are not definitely and firmly convinced that the circuit court made a mistake when it found that the Board's findings, that the operator was adjusting or unjamming material, were supported by competent, material, and substantial evidence.

Accordingly, we conclude that the circuit court applied the correct legal principles when reviewing the Board's decision to apply 29 CFR 1910.147 and did not err by applying the substantial-evidence test to the Board's findings. Even though the injured employee was not specifically a maintenance employee and was injured during production operations, Part 85 applied because he was required to place his hands within the machine's zone of danger to adjust or unjam the press.

## V. MINOR-TOOL-CHANGE EXCEPTION

Argent argues that the circuit court erred by upholding the Board's decision regarding Instance A because it was not required to have a lockout device to disable the press while the operator adjusted the material's alignment since he was making routine and repetitive adjustments that were integral to production, and thus his activities fell within the minor-tool-change exception to Part 85. We conclude that the circuit court applied the correct legal principles when it upheld the Board's determination that this exception did not apply.

The minor-tool-change exception is contained within other exceptions to the application of hazardous-energy lockout procedures under Part 85:

(2) Application.

(i) This standard applies to the control of energy during servicing and/or maintenance of machines and equipment.

(ii) Normal production operations are not covered by this standard (See subpart 0 of this part). Servicing and/or maintenance which takes place during normal production operations is covered by this standard only if:

(A) An employee is required to remove or bypass a guard or other safety device; or

(B) An employee is required to place any part of his or her body into an area on a machine or piece of equipment where work is actually performed upon the material being processed (point of operation) or where an associated danger zone exists during a machine operating cycle.

Note: Exception to paragraph (a)(2)(ii): *Minor tool changes and adjustments*, and other minor servicing activities, which take place during normal production operations, *are not covered by this standard if they are routine, repetitive, and integral to the use of the equipment for production*, provided that the work is performed using alternative measures which provide effective protection (See subpart 0 of this part). [29 CFR 1910.147(a).]

First, Argent argues that the Board erred as a matter of law by determining that the minor-tool-change exception did not apply because it ruled that something needed to occur every time the press was run to be considered repetitive. As previously indicated, minor tool changes and adjustments "are not covered by this standard if they are routine, repetitive, and integral to the use of the equipment for production," as long as adequate alternative measures effectively protect the employee. 29 CFR 1910.147(a)(2)(ii). In this case, the Board determined that the minor-tool-change exception did not apply because, although the adjustments were routine, they were not repetitive since they were not required during each cycle and were unpredictable.

We agree with the Board that the words "routine" and "repetitive" are not synonymous. "When parsing a statute, we presume every word is used for a purpose." *Pohutski v City of Allen Park*, 465 Mich 675, 683; 641 NW2d 219 (2002). The use of different words generally indicates that the words have different meanings. *US Fidelity & Guaranty Co v Mich Catastrophic Claims Ass'n (On Rehearing)*, 484 Mich 1, 14; 795 NW2d 101 (2009). The word "repetitive" is defined as "repetitious" or "containing repetition." Merriam-Webster's Collegiate Dictionary (12th ed), p 1344. Something is "repetitious" when it is "characterized or marked by repetition; *esp* : tediously repeating." *Id*. Something is predictable when it is "capable of being predicted : able to be known, seen, or declared in advance" or "behaving in a way that is expected." *Id*. at 1249. In contrast, the word "routine" is defined as "habitual or mechanical performance of an established procedure < the ~ of factory work >." *Id*. at 1382. Accordingly, we further agree with the Board that something that is unpredictable cannot be repetitive. An action that cannot be foretold in advance is not an action that is tediously repeated. Because the Board's interpretation was consistent with

29 CFR 1910.147, the circuit court did not apply an incorrect legal principle when affirming the Board's decision.

Further, we note that the Board's finding were supported by competent, material, and substantial evidence under these definitions. The supervisor agreed that it was a normal occurrence for material to come out of alignment. However, the supervisor explained that alignment issues depended on the type of material, including its shape and texture. A witness opined that straightening the material was not repetitive because it did not occur every time the press was stamped. We conclude that the circuit court did not err by determining that competent, material, and substantial evidence supported the Board's decision. Consistent with our prior definition of repetitive, there is no indication that material adjustments were tediously repeating or predictable. The only testimony regarding this point supported that the material adjustments were routine without being repetitive.

Second, Argent argues that the Board failed to address the operator's failure to follow Argent's established safety procedures, which were the use of safety blocks. We conclude that the Board did not err by failing to address the safety-block issue because the adequacy of alternative safety measures only comes into play after it is determined that the adjustment was routine, repetitive, and integral to using the equipment. This Court reads the statute as a whole while "reading individual words and phrases in the context of the entire legislative scheme." *Sunrise Resort Ass'n, Inc*, 511 Mich at 334 (quotation marks and citation omitted). Considered in its grammatical context, 29 CFR 1910.147 makes it clear that alternative measures of protection only need to be considered if the rest of the requirements are met:

> Exception to paragraph (a)(2)(ii): Minor tool changes and adjustments, and other minor servicing activities, which take place during normal production operations, are not covered by this standard if they are routine, repetitive, and integral to the use of the equipment for production, *provided that the work is performed using alternative measures which provide effective protection* . . . . [29 CFR 1910.147(a)(2)(ii).]

The word "provided," when used as a conjunction, means "on condition that : with the understanding : IF." *Merriam-Webster's Collegiate Dictionary* (12th ed), p 1278. Accordingly, the phrase "provided that," when used in this context, expresses a conditional statement. The Board need only consider whether alternative safety measures provided effective protection if the previous requirements were met. Because Argent did not make it past the hurdle that the activity is "repetitive," there was no reason for the Board to address the additional requirement of whether the safety blocks would have been an alternative measure that provided effective protection.

## VI. IDENTIFICATION OF GRAVITY AS AN ENERGY SOURCE

Argent contends that the circuit court erred by upholding the Board's decision regarding Instance B because gravity is not an energy source pursuant to 29 CFR 1910.147(b). According to Argent, it was therefore not required to identify, document, or provide procedures to control gravitational hazards. We conclude that the circuit court did not make a material error of law or misapply the competent, material, and substantial-evidence test when reviewing the Board's

decision because gravity can be a hazardous-energy source and Argent failed to document its procedures regarding the use of the safety blocks to protect against this energy source.

Part 85 requires an employer to create programs designed to protect employees from the unexpected release of stored energy by a machine or equipment:

> The employer shall establish a program consisting of energy control procedures, employee training and periodic inspections to ensure that before any employee performs any servicing or maintenance on a machine or equipment where the unexpected energizing, start up or release of stored energy could occur and cause injury, the machine or equipment shall be isolated from the energy source, and rendered inoperative. [29 CFR 1910.147(c)(1).]

To comply with this section, "[p]rocedures shall be developed, documented and utilized for the control of potentially hazardous energy when employees are engaged in the activities covered by this section." 29 CFR 1910.147(c)(4)(i) (emphasis added). The procedures must "clearly and specifically outline the . . . techniques to be utilized for the control of hazardous energy . . . ." 29 CFR 1910.147(c)(4)(ii). This must include "[s]pecific procedural steps for the placement, removal and transfer of lockout devices or tagout devices and the responsibility for them[.]" 29 CFR 1910.147(c)(4)(ii)(C). Further, regarding protective materials, "[l]ockout devices and tagout devices shall be singularly identified[.]" 29 CFR 1910.147(c)(5)(ii). The employer must provide training to ensure that the energy-control program is understood by employees and that the employees have the knowledge and skill required to safely apply the energy-control devices. 29 CFR 1910.147(c)(7)(i).

First, Argent argues that, as a matter of law, it was not required to identify gravity as a hazard because Part 85 does not identify gravity as an energy source. Part 85 defines an energy source as "[a]ny source of electrical, mechanical, hydraulic, pneumatic, chemical, thermal, or other energy." 29 CFR 1910.147(b) (emphasis added). Again, the word "or" is a disjunctive term. *Ellison*, 320 Mich App at 179. Even though gravity is not listed as a recognized energy source, an employer is required to identify all sources of potentially hazardous energy. Accordingly, the circuit court did not apply incorrect legal principles by upholding the Board's determination that gravity is a potential source of hazardous energy under 29 CFR 1910.147(b).

Further, the circuit court did not err when it determined that competent, material, and substantial evidence supported the Board's finding that gravity was a hazardous-energy source in this case. The MIOSHA supervisor testified that the fact that the rollers fell established the presence of a hazard. Argent's maintenance manager testified that the falling of the rollers was kinetic energy, which had been addressed. A person who performed maintenance on the press testified that it was gravity and the weight of the roller the caused the roller to lower when air was released from the pneumatic lines. Argent's maintenance manager testified that, if there was insufficient lubrication on a roller, it could hang up and not lower properly during lockout. The maintenance person testified that, when that occurred, it was virtually impossible to not see that the rollers were crooked. However, the MIOSHA investigator opined that gravity remained an issue because the roller could drop even when the machine was unpowered. Even Argent's appeal to MIOSHA indicated the safety blocks were "a control device to prevent a gravity related hazard."

Sufficient evidence supported the Board's finding that gravity was a potentially hazardous-energy source in the press area.

Second, Argent argues that there was no evidence that (1) the safety blocks were insufficient to protect employees from the rollers and the screen guard while they straightened stock, and (2) the operator was properly trained to operate the press using the blocks.[4] These arguments do not address the basis for citation. An employee's training and understanding of safety procedures is part of 29 CFR 1910.147(c)(7)(i), but 29 CFR 1910.147(c)(4)(i) separately requires the employer to identify and document those procedures. Under Instance B, MIOSHA cited Argent for insufficiently *identifying* the presence of a gravitational hazard and not *documenting* the use of the safety blocks as a protection against that hazard rather than the efficacy of the blocks themselves or whether they would have provided adequate protection if the employee had used them.

In this case, the Board found that Argent's procedures failed to provide employees with notice that gravity could cause the roller to come down unexpectedly. Argent's plant manager testified that there were machine-specific procedures for the Sheridan press, including lockout procedures and safety tools. However, the MIOSHA investigation supervisor testified that Argent's written materials and safety manuals did not refer to the wooden blocks, and notably, different employees had given different statements about uses of the blocks. More than a scintilla of evidence supported that Argent's procedures did not identify the hazard that the rollers could drop and that those procedures were not documented in Argent's machine-specific manual. Accordingly, the circuit court did not clearly err when determining whether the Board's decision was supported by competent, material, and substantial evidence.

Lastly, Argent argues that the Board incorrectly found that Argent was aware of but failed to prevent "ghost cycling," which occurs when a machine cycles when the operator did not intend it to. We agree with Argent that any ghost cycling is not relevant to this issue because the citation for Instance B was not based on the presence of ghost cycling. But, because the Board's analysis was sufficient and complete regarding Argent's failure to document its procedures regarding the gravity-related hazard posed by the rollers, any error regarding ghost cycling was harmless. See *Ellison*, 320 Mich App at 179 ("The trial court's error is harmless if it is not decisive to the case's outcome.")

Affirmed.

/s/ Colleen A. O'Brien
/s/ Anica Letica

---

[4] To the extent that Argent argues related to Instance B that lockout procedures are not required when an employee is engaged in normal production activities and that the rollers were not part of the die area of the machine, we reject these arguments for the same reasons that we rejected them regarding Instance A.